# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO: _____ **3:20-CV-252-KC** |
| *ex rel.* ANGELA GOMEZ and | § | |
| CHRISTOPHER HICKS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | RELATORS ANGELA GOMEZ |
| KOMAN CONSTRUCTION, LLC, | § | AND CHRISTOPHER HICKS' |
| KOMAN ADVANTAGE, LLC, | § | ORIGINAL COMPLAINT |
| KOMAN HOLDINGS, LLC, | § | |
| NATIVES OF KODIAK, INC., | § | |
| STORMWATER PLANS, LLC DBA SWP | § | |
| CONTRACTING & PAVING, | § | **FILED UNDER SEAL** |
| L&J CONTRACTORS, INC., | § | PURSUANT TO 31 U.S.C. § |
| BFL CONSTRUCTION CO., INC., | § | 3730(b)(2) |
| HARRISON, WALKER AND HARPER, LP, | § | |
| BOXX MODULAR, INC., and | § | |
| DONLEY CONSTRUCTION, LLC, | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |

## RELATORS ANGELA GOMEZ AND CHRISTOPHER HICKS' ORIGINAL COMPLAINT

## TABLE OF CONTENTS

I.     Introduction to Case..................................................................1

II.    Jurisdiction and Venue .............................................................2

III.   Introduction to Relators ...........................................................2

    A.    Background on Relator Angela Gomez ............................2

    B.    Background on Relator Christopher Hicks ......................3

    C.    Original Source and Disclosures.....................................4

IV.   Introduction to Defendants .......................................................5

    A.    KOMAN Construction, LLC ...........................................5

    B.    KOMAN Advantage, LLC ...............................................6

    C.    KOMAN Holdings, LLC...................................................6

    D.    Natives of Kodiak, Inc. ...................................................7

    E.    Stormwater Plans LLC DBA SWP Contracting & Paving ...................................7

    F.    L&J Contractors, Inc. .....................................................8

    G.    BFL Construction Co., Inc. ..............................................9

    H.    Harrison, Walker and Harper, LP ...................................9

    I.    Boxx Modular, Inc. .......................................................10

    J.    Donley Construction, LLC .............................................10

V.    Respondeat Superior and Vicarious Liability ..........................11

VI.   Federal Acquisition Regulation ("FAR") ...............................11

    A.    Overview ........................................................................11

    B.    Contracting by Negotiation ...........................................12

    C.    Contractor Responsibilities ...........................................12

i

| | D. | Submission of Claims to the Government | 13 |
|---|---|---|---|
| | E. | Contractor Certifications | 13 |
| | F. | Prohibition of Bid Rigging and Other Collusive Antitrust Violations | 14 |
| | G. | Consequences of Noncompliance | 15 |
| VII. | | Anti-Kickback Act | 15 |
| | A. | Overview | 15 |
| | B. | Definition of Kickback | 15 |
| | C. | Prohibition of Kickbacks | 16 |
| VIII. | | Defendants' Collusive and Fraudulent Schemes | 16 |
| | A. | KOMAN and L&J conspired to defraud the Government. | 16 |
| | | 1. KOMAN's General Manager awarded subcontracts to a company owned by his wife. | 16 |
| | | 2. Specific Examples of KOMAN's Improper Subcontract Awards to L&J | 17 |
| | | a. DHS Contract – CBP Property in Eagle Pass, Texas | 17 |
| | | b. DHS Contract – CBP Property in San Angelo, Texas | 18 |
| | | c. DoD ACOE Contract – Yuma Proving Grounds | 18 |
| | | d. DoD ACOE Contracts – El Paso CPC Modular Project | 19 |
| | B. | KOMAN has not supervised or meaningfully participated in projects subcontracted to Donley Construction. | 20 |
| | C. | Defendants have engaged in complementary bidding, bid rigging, and other collusive activities. | 21 |
| | | 1. DHS Contract No. 70B01C19D00000067 | 21 |
| | | 2. Tyndall Air Force Base (contract no. W9127819C0044) | 23 |
| | | 3. KA subcontracts to KOMAN | 24 |
| | D. | KOMAN paid for expensive outings with contractors and subcontractors | 24 |

IX.   KOMAN's Retaliation Against Relators ...................................................................26

    A.    KOMAN unlawfully retaliated against Relator Christopher Hicks. ...................26

    B.    KOMAN unlawfully retaliated against Relator Angela Gomez. .........................31

X.    Actionable Conduct by Defendants.....................................................................35

    A.    False Claims Act ......................................................................................35

        1.    Applicable Law ..................................................................35

        2.    Defendants' Violations of the False Claims Act......................................36

            a.    Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) ......................................................36

            b.    Making or Using False Records or Statements Materials to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) .............38

            c.    Conspiracy (31 U.S.C. § 3729(a)(1)(C))....................................39

    B.    Defendants' Retaliation Against Relators ............................................................40

XI.   Causes of Action ...................................................................................41

    A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) .......................................................................41

    B.    Count II – Making or Using False Records or Statements Materials to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) .................................43

    C.    Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C)) ...........................................44

    D.    Count IV – Retaliation (31 U.S.C. § 3730(h)) ....................................................46

XII.  Demand for Jury Trial ....................................................................................46

XIII. Documentary Evidence....................................................................................46

1.     On behalf of the United States of America, and on their own behalf, Plaintiff-Relators Angela Gomez ("Gomez") and Christopher Hicks ("Hicks") (collectively, "Relators") bring this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732. Relators seek to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and on their own behalf and would respectfully show the following:

## I.     INTRODUCTION TO CASE

2.     KOMAN Construction, LLC ("KOMAN") is a small disadvantaged business that contracts with the Department of Defense and other federal agencies to provide base operations support, construction management, and general contracting services. KOMAN is a subsidiary of Natives of Kodiak ("NOK"), an Alaska Native Corporation that also owns KOMAN Holdings and KOMAN Advantage ("KA").

3.     Relator Angela Gomez worked for KOMAN as Business Manager for several years, and Relator Christopher Hicks has worked for KOMAN since September 2016, initially as a project manager and later as the Senior Project Manager. Both have worked closely with Robert Matthew Yates, who was the General Manager of KOMAN before becoming the General Manager for KA earlier this year.

4.     As General Manager, Mr. Yates had authority to submit bids for prime contracts and approve subcontracts. Mr. Yates directed his wife, Jean Yates, to start a construction company, L&J Construction ("L&J"), and then steered multiple subcontracts to L&J.

5.     After Mr. Yates transitioned to KA, KOMAN started subcontracting all electrical work to KA; however, the parties now have an arrangement in which KA bids for the prime contract and then subcontracts work to KOMAN. Either way, NOK essentially doubles its profits.

6.     KOMAN also has a fraudulent arrangement with subcontractor Donley Construction ("Donley"). KOMAN has failed to supervise or meaningfully participate in multiple projects it has been awarded; instead, KOMAN subcontracts to Donley, and Donley runs everything from start to finish. KOMAN did not even assign a Project Manager to some of the projects.

7.     KOMAN and the NOK family of companies have a pattern and practice of conspiring with other companies to circumvent the fair bid process. Defendants have engaged in bid rigging, complementary bidding, and other collusive activities that undermine the integrity of the contracting process and have also given and/or received kickbacks, such as expensive fishing trips, special events, and other gratuities.

8.     Defendants have worked together to defraud the Government out of millions.

## II.     JURISDICTION AND VENUE

9.     Jurisdiction and venue are proper in the Western District of Texas pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relators' claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Western District of Texas. Defendants engage in business in the Western District of Texas and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## III.     INTRODUCTION TO RELATORS

### A.     Background on Relator Angela Gomez

10.     Relator Angela Gomez began working for KOMAN Construction in October 2017. She played multiple roles there, including business manager, business development, and

construction project administrator. As the business manager, she was a liaison with the SBA and worked on compliance issues, such as KOMAN's standard operating procedures. She was also involved in the contracting process, including bidding, proposals, budgets, and document management. In terms of business development, Ms. Gomez conducted site visits/bid walks, managed projects, prepared bids and proposals, and had various other responsibilities.

11.    Ms. Gomez's duties as a construction project administrator included procuring equipment and materials, acting as a liaison with customers and contracting officers, producing reports, reviewing invoices and project costs, document management, and other related responsibilities.

12.    Ms. Gomez was constructively discharged in July 2020 after experiencing sex discrimination, harassment, a hostile work environment, and other retaliation due to voicing complaints about KOMAN's fraud.

**B.    Background on Relator Christopher Hicks**

13.    Relator Christopher Hicks has over twenty years of experience in the construction industry and has worked on numerous projects involving federal contracts. From 2005 to 2013, Mr. Hicks owned a construction company, Third Day Construction, and performed a number of contracts for NASJRB Fort Worth, TX, NASJRB Belle Chasse, and many other federal facilities. Mr. Hicks also assisted with demolition in St. Bernard Parish, Louisiana after Hurricane Katrina and coordinated EPA, LDEQ, DOT, OSHA and multiple other federal agencies to help write amended protocols for demolition and ACM demolition. Mr. Hicks started working as a project manager for Kirlin Builders in March 2013 and managed multiple USACE construction projects in Fort Campbell, Kentucky.

14. In September 2016, Mr. Hicks became a project manager for KOMAN Construction. He supervised multiple NAVFAC projects in New Orleans, including demolition of twelve structures on base and repairing a hangar on an operational Navy flight line. KOMAN promoted Mr. Hicks to Senior Project Manager in February 2019, where his primary focus has been on managing financials and projections on projects, business development, and training personnel. He has acted as proposal captain on multiple projects throughout the US and wrote the technical portion of proposals on numerous offerings. He also managed $20.5 million in five projects throughout the US.

15. Mr. Hicks is still employed by KOMAN, but he was demoted to project manager in August 2020 in retaliation for refusing to participate in fraud and speaking out against it. Mr. Hicks' superiors took most of his projects away when they demoted him, and they have also harassed him repeatedly and subjected him to a hostile environment.

## C.    Original Source and Disclosures

16. There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relators are original sources as defined therein. Relators have direct and independent knowledge of the information on which their allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing a complaint by submitting pre-filing disclosure statements on July 14, 2020 and September 21, 2020.

17. As required pursuant to 31 U.S.C. § 3730(b), Relators will submit an original disclosure statement to the Attorney General of the United States and the United States Attorney for the Western District of Texas contemporaneously with the service of their Original Complaint.

## IV.    INTRODUCTION TO DEFENDANTS

**A.    KOMAN Construction, LLC**

18.    Defendant KOMAN Construction, LLC ("KOMAN") was incorporated in Alaska in 2015 and is headquartered in Chandler, Arizona. KOMAN's corporate office is located at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503, and its registered agent is Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101. KOMAN is a subsidiary of Defendant KOMAN Holdings, LLC, which is a subsidiary of Defendant Natives of Kodiak, Inc.

19.    KOMAN is a small disadvantaged business[1] that contracts with the Department of Defense and other federal agencies to provide base operations support services, as well as construction management services, and general contracting.

20.    A contract with KOMAN nets the Government the procurement benefit of best-value products, as well as the contracting efficiencies and financial benefits of employing an Alaska Native Corporation SBA 8(a) participant.

21.    The General Manager of KOMAN for most of the relevant timeframe was Robert Matthew Yates, who is the husband of Jean M. Yates, owner of subcontractor L&J Construction. Robert Yates had the final approving authority for many subcontracts relevant to this case. Robert Yates is now the General Manager of KOMAN Advantage, and Robert Kyrklund is now the General Manager at KOMAN Construction. Mr. Yates brought Mr. Kyrklund into KOMAN Construction prior to transitioning to KOMAN Advantage.

---

[1] A Small Disadvantaged Business (SDB) is a small business that is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged.

**B.      KOMAN Advantage, LLC**

22.      Defendant KOMAN Advantage, LLC ("KA") was incorporated in Alaska on January 24, 2019. KA's corporate office in Alaska is located at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503. KA is headquartered at 3129 W. Hwy 83, Unit 8, Sonoita, Arizona 85637, and its registered agent is Corporation Service Company, 9360 Glacier Hwy, Suite 202, Juneau, Alaska 99801.

23.      KA is a wholly owned subsidiary of Defendant Natives of Kodiak, Inc., benefiting as an Alaskan Native Corporation SBA 8(a) participant. KA specializes in programmatic, operational, logistics, engineering, and electrical support services for government and private sector clients. KA advertises that it employs multiple subcontractors and that its services include lighting, utilities, electrical protection, maintenance services, installation support, panel upgrades, and program support.

24.      Shortly after getting KA off the ground, KOMAN began subcontracting work to KA. Now, however, KA bids on contracts as the prime contractor and subcontracts work to KOMAN.

**C.      KOMAN Holdings, LLC**

25.      Defendant KOMAN Holdings, LLC ("KOMAN Holdings") was incorporated in Alaska in 2008 and is headquartered in Anchorage, Alaska. Koman Holdings' corporate office is located at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503. Koman Holdings' registered agent is Corporation Service Company, 9360 Glacier Highway, Suite 202, Juneau, Alaska 99801.

26.      KOMAN Holdings, a wholly owned subsidiary of Natives of Kodiak ("NOK"), is the parent company of KOMAN Construction, Inc., KOMAN Advantage, and SWP Contracting and Paving. KOMAN Holdings is a holding company established to own and oversee most of the

operating entities of the NOK family of companies. KOMAN Holdings, through its subsidiaries, provides environmental consulting services, construction, remediation, civil contracting, civil engineering, and timber and forest management. KOMAN Holdings also provides goods and services to various federal agencies, the State of Alaska, and commercial clients.

**D.     Natives of Kodiak, Inc.**

27.     Defendant Natives of Kodiak, Inc. ("NOK") was incorporated in Alaska in 1973 and is headquartered in Kodiak, Alaska. NOK's corporate office is located at 215 Mission Road, Suite 212, Kodiak, Alaska 99615, and its registered agent is Corporation Service Company, 9360 Glacier Highway, Suite 202, Juneau, Alaska 99801.

28.     NOK is an Alaska Native Corporation incorporated under Alaska law and pursuant to the 1971 federal Alaska Native Claims Settlement Act ("ANCSA")[2]. NOK is managed by its President and CEO, Jim Erickson, and is governed by a nine-member Board of Directors comprised of elected shareholders. NOK is the parent corporation of KOMAN Holdings, LLC.

**E.     Stormwater Plans, LLC DBA SWP Contracting & Paving**

29.     Defendant Stormwater Plans, LLC DBA SWP Contracting & Paving ("SWP") was incorporated in Arizona on March 4, 2019. SWP's corporate office is located at 5624 N. 54th Ave., Glendale, Arizona 85301. SWP's registered agent is Corporation Service Company, 8825 N. 23rd Ave, Ste. 100, Phoenix, Arizona 85021-4148.

30.     SWP is a wholly owned subsidiary of NOK, benefiting as an Alaskan Native Corporation SBA 8(a) participant. SWP specializes in construction and its services include

---

[2] An Alaska Native Corporation is any Regional, Village, Urban, or Group Corporation organized under the laws of the State of Alaska in accordance with the ANCSA. Natives of Kodiak is one of the original corporations created by the ANCSA, whereby the Alaska natives surrendered their ancestral land claims for "certain valuable considerations" that included federal government contracting preferences. The Act established a system of village and regional Native corporations to manage the lands and cash payments and made extensive provisions regarding the operations of the corporations.

underground construction, excavating, design/build construction, pavement preservation, demolition, concrete, utilities, and airfield construction and lighting. KOMAN has subcontracted with SWP on multiple projects.

## F.    L&J Contractors, Inc.

31.    Defendant L&J Contractors, Inc. (L&J) is a for-profit business that was incorporated in the State of Arizona on September 19, 2018. L&J is a construction company specializing in various aspects of general contracting. L&J lists its corporate address as 38 Page Lane, Elgin, Arizona 85611, which is the residential address of Robert Matthew Yates and his wife, Jean M. Yates.

32.    L&J, at the time of incorporation, listed Jean Yates as the President of the company. Jean Yates was also listed as the Director and President of the company on an October 9, 2019 annual report filed with the Arizona Secretary of State. *See* exhibit 1 (L&J October 9, 2019 Annual Report).

33.    According to records from the Mississippi Secretary of State, L&J opened a branch in Gautier, Mississippi on January 3, 2019. The records list the Mississippi branch as located at 1824 Piney Lane, Gautier, Mississippi 39553.[3] Property records reveal this location is a single-family residence, and it is believed to be owned by Rita Garris, who is Jean Yates' sister and Robert Yates' sister-in-law. The Secretary of State records list Lucas Robinson as President, Jean Yates as Treasurer, and Rita Garris as Secretary. Robert Yates also hired Ms. Garris to work at KOMAN after he commenced contracting to L&J.

---

[3] From September 25, 2019 through December 29, 2019, the status of the Mississippi branch was "Inactive." On December 29, 2019, the Mississippi branch reported a change in corporate status from "Good Standing" to "Withdrawn."

### G. BFL Construction Co., Inc.

34.     Defendant BFL Construction Co., Inc. ("BFL") is a commercial construction company based in Phoenix, Arizona and has been in operation since 1973. Its principal office is located at 700 E. Broadway Blvd., Suite 200, Tucson, Arizona 85719, and its registered agent is Capitol Corporate Services, Inc., 8825 N. 23rd Ave, Suite 100, Phoenix, Arizona 85021.

35.     BFL performs a wide array of services, including pre-construction services, design/build services, and construction management. BFL's design/build services operate as one entity that works under a single contract so that BFL works in tandem with the client for various design and construction resources. BFL's services include preparation of bid packages, scheduling, cost control, value engineering, life cycle evaluation, and construction administration. BFL is a subcontractor to KOMAN.

### H. Harrison, Walker and Harper, LP

36.     Defendant Harrison, Walker and Harper, LP ("HWH") was founded in 1887 and is the oldest general contractor located in the State of Texas. HWH's principal place of business is located at 222 Hickory St., Paris, Texas 75460, and its registered agent is Woodrow W. Harper, 2510 South Church, Paris, Texas 75460.

37.     HWH builds, renovates, and maintains operations and infrastructure for various public and private sector clients. Incorporated into HWH's construction services is an integrated design-build, and it manages all architects, general contractors, subcontractors, vendors, and suppliers throughout the building period. HWH's industrial services include pouring concrete, fabricating steel, and installing necessary equipment. Additional services provided by HWH include engineering, design, site analysis, and transportation logistics. HWH is a subcontractor to KOMAN.

### I.      Boxx Modular, Inc.

38.      Defendant Boxx Modular, Inc. ("Boxx") was incorporated in Texas on July 9, 2010. Boxx's corporate office is located at 3475 High River Rd., Fort Worth, Texas 76155. Boxx's registered agent is National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

39.      Boxx is a subsidiary of the Black Diamond Group, a company that provides services in Canada, the United States, and Australia. Boxx rents, leases, and sells temporary and permanent modular buildings, including mobile offices, classrooms, lavatories, medical centers, bank facilities, and storage containers. Boxx is a subcontractor to KOMAN.

### J.      Donley Construction, LLC

40.      Defendant Donley Construction, LLC ("Donley") was founded in 1979 and maintains a principal address at 716 South Philadelphia Blvd., Aberdeen, MD 21001. Donley's registered agent is Ilani A. Donley, 2304 Snow Rd., Edgewood, Maryland 21040.

41.      Donley is a Native American owned business that has been working on federal contracts for over twenty years. Donley has many ongoing or completed IDIQ, MATOC, JOC and SABER contracts with all branches of the Department of Defense. These contracts are for construction, renovation, repair, and improvements to real property at existing federal facilities. KOMAN has awarded multiple subcontracts to Donley.

42.      Unless otherwise specified, KOMAN Construction, LLC, KOMAN Advantage, LLC, KOMAN Holdings, LLC, Natives of Kodiak, Inc., SWP Contracting & Paving, L&J Contractors, Inc., BFL Construction Co., Inc., Harrison, Walker and Harper, LP, Boxx Modular, Inc., and Donley Construction, LLC will be collectively referred to herein as "Defendants."

## V.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

43.    Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

44.    Defendants KOMAN, KA, SWP, KOMAN Holdings, and NOK are related entities sharing common employees, offices, and business names such that they are jointly and severally liable. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

45.    KOMAN, KA, and SWP are wholly owned subsidiaries of KOMAN Holdings and NOK. The NOK board oversees and manages KOMAN, KA, KOMAN Holdings, and SWP. KOMAN and KA share an address at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503, which is where parent companies KOMAN Holdings and NOK are also headquartered.

## VI.    FEDERAL ACQUISITION REGULATION ("FAR")

### A.    Overview

46.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for federal contracts.   The FAR is codified in Title 48 of the United States Code of Federal Regulations.

47.    The Defense Federal Acquisition Regulation Supplement ("DFARS") is a system of regulations administered by the Department of Defense for the purpose of implementing and

supplementing the FAR. DFARS establishes delegations of FAR authorities, deviations from FAR requirements, DoD-wide policies, and should be read in conjunction with the primary set of rules in FAR.

**B.      Contracting by Negotiation**

48.      Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract. 48 C.F.R. § 15.000. The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value.  48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.  48 C.F.R. § 2.101(b)(2).

49.      An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance.  48 C.F.R. § 15.304(b).

**C.      Contractor Responsibilities**

50.      Pursuant to 48 C.F.R. § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and, (2) Tendering to the Government for acceptance only those supplies or services that conform to contract requirements." Contractors are responsible for implementing "procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. § 46.105(c).

### D.  Submission of Claims to the Government

51.     Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance.  With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. 48 C.F.R. § 32.905(c). Documentation must include, at a minimum, description of the supplies delivered, or services performed, and quantities of supplies received and accepted, or services performed.  48 C.F.R. § 32.905(c)(2) and (3).

52.     Pursuant to 48 C.F.R. § 32.007(a)(1), contract financing payments are due the thirtieth day after the designated billing office receives "a proper contract financing request." A proper contract financing request "must comply with the terms and conditions specified by the contract," and the contractor must correct any defects in requests submitted. 48 C.F.R. § 32.007(c).

### E.  Contractor Certifications

53.     The general FAR invoice requires the contractor to certify that the voucher is proper.  Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment."  48 C.F.R. § 53.301-1034.  By certifying that the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

54.     Contractors are also required to make the following certifications when submitting any claim exceeding $100,000: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is

liable; and that I am duly authorized to certify the claim on behalf of the contractor." *See* 48 C.F.R. § 33.207(c).

## F.    Prohibition of Bid Rigging and Other Collusive Antitrust Violations

55.    Regarding bidding, the offeror must certify that the prices in the offer have been "arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices." 48 C.F.R. § 52.203-2(a)(1)(i). The prices in the offer must not have been "knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law." C.F.R. § 52.203-2(a)(2). No attempt can be made by the offeror to induce any other offeror or competitor "to submit or not to submit an offer for the purpose of restricting competition." 48 C.F.R. § 52.203-2(a)(3).

56.    Per 48 C.F.R. § 3.303(b), "the antitrust laws are intended to ensure that markets operate competitively." Therefore, agreements made among competing entities that restrain "the natural operation of market forces [are] suspect." Activities that evidence an antitrust violation may include: "an industry price to which contractors refer in formulating their offers, a sudden change from competitive bidding to identical bidding, simultaneous price increases or follow-the-leader pricing, rotation of bids or proposals, division of the market, establishment by competitors of a collusive price estimating system, the filing of a joint bid by two or more competitors, any incidents suggesting direct collusion among competitors, and assertions by the employees, former employees, or competitors of offerors, that an agreement to restrain trade exists." 48 C.F.R. § 3.303(c)(1)-(9). Agencies are required to report to the Attorney General any bids or proposals that are suspected to be in violation of antitrust laws. 48 C.F.R. § 3.303 (a).

## G. Consequences of Noncompliance

57.    A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract, constitutes grounds for debarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). Moreover, the Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

## VII.    ANTI-KICKBACK ACT

## A.    Overview

58.    "The Anti-Kickback Act of 1986 was passed to deter subcontractors from making payments and contractors from accepting payments for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or a subcontract relating to a prime contract." 48 C.F.R. § 3.502-2. The Anti-Kickback Act is codified in Title 41, chapter 87, of the United States Code.

## B.    Definition of Kickback

59.    Pursuant to both 48 C.F.R. § 3.502-1 and 41 U.S.C. § 8701(2), "kickback means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

### C. Prohibition of Kickbacks

60.     "The Kickbacks statute prohibits any person from providing, attempting to provide, or offering to provide any kickback." 48 C.F.R. § 3.502-2(a)(1). Additionally, the statute prohibits "soliciting, accepting, or attempting to accept any kickbacks." 48 C.F.R. § 3.502-2(a)(2). The statute also prohibits "including, directly or indirectly, the amount of any kickback in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States." 48 C.F.R. § 3.502-2(a)(3). These prohibitions are also stated in Title 41, chapter 87, section 8702 of the United States Code.

61.     Criminal penalties will be imposed on any person who "knowingly and willfully engages" in prohibited conduct such as kickbacks. 48 C.F.R. § 3.502-2(b). The United States can recover civil penalties "from any person who knowingly engages in such prohibited conduct and from any person whose employee, subcontractor, or subcontractor employee provides, accepts, or charges a kickback." 48 C.F.R. § 3.502-2(c).

### VIII.   DEFENDANTS' COLLUSIVE AND FRAUDULENT SCHEMES

62.     Relators have detailed knowledge of multiple schemes employed by Defendants, including bid rigging, complementary bidding, acting as a pass-through, awarding subcontracts without competition, giving and receiving kickbacks, and other fraudulent activities.

### A. KOMAN and L&J conspired to defraud the Government.

#### 1. KOMAN's General Manager awarded subcontracts to a company owned by his wife.

63.     Robert Matthew Yates, former General Manager of KOMAN, entered into a conspiracy to defraud the Government by engaging in an illicit business relationship with his wife, Jean Yates, sister-in-law Rita Garris, Lucas Robinson, and Ricky Robinson. As General Manager of KOMAN, Robert Yates had the authority to steer subcontracts to the business entity of his

choosing. His wife established a business entity, L&J, for the sole purpose of funneling subcontracts, beginning immediately after the projects were proposed and immediately before the initial prime contracts were awarded.

64. Lucas Robinson, a service-disabled veteran, was brought into the picture by his brother, Ricky Robinson, who had previously worked with Robert Yates in other companies. (Ricky Robinson also had a subcontracting relationship with KOMAN through his work with BFL Construction.) Lucas Robinson had very little knowledge regarding construction and was brought into the conspiracy as a "straw" corporate officer in an effort to conceal the fact that Robert Yates' wife owned L&J. Lucas Robinson was given the title of President and signed all contractual documents on behalf of L&J so as not to draw attention to the Yates in this illicit business relationship.

    **2.    Specific Examples of KOMAN's Improper Contract Awards to L&J**

        **a.    DHS Contract – CBP Property in Eagle Pass, Texas**

65. The following timeline summarizes key events related to KOMAN's improper subcontract award to L&J to perform work on <u>DHS contract number 70B01C18C-00000170</u>:

| Date | Description |
|---|---|
| September 14, 2018 | A Department of Homeland Security (DHS) project to provide construction repairs for Customs and Border Protection (CBP) property located in Eagle Pass, Texas is proposed. |
| September 19, 2018 | Jean Yates founds L&J. |
| September 21, 2018 | KOMAN is awarded DHS contract number 70B01C18C-00000170 to provide construction repairs on the Eagle Pass property. The contract award totaled $1,012,018.00. |
| November 1, 2018 | Robert Yates approves a subcontract award to L&J in the amount of $587,850.00 for work on the Eagle Pass DHS prime contract. *See* exhibit 2 (November 1, 2018 subcontract between KOMAN and L&J). |

b.     **DHS Contract – CBP Property in San Angelo, Texas**

66.    The following timeline summarizes key events related to KOMAN's improper subcontract award to L&J to perform work on <u>DHS contract number 70B01C18C-00000160</u>:

| Date | Description |
|---|---|
| September 17, 2018 | A DHS project to provide infrastructure and building repairs of CBP property in San Angelo, Texas is proposed. |
| September 19, 2018 | Jean Yates founds L&J. |
| September 27, 2018 | KOMAN is awarded DHS contract number 70B01C18C-00000160 to provide infrastructure and building repairs on the San Angelo property. The contract award totaled $1,732,291.00. |
| December 19, 2018 | KOMAN approves a subcontract award to L&J in the amount of $261,376.14 for work on the San Angelo DHS prime contract. *See* exhibit 3 (December 19, 2018 subcontract between KOMAN and L&J). |

c.     **DoD ACOE Contract – Yuma Proving Grounds**

67.    The following timeline summarizes key events related to KOMAN's improper subcontract award to L&J to perform work on <u>DoD (ACOE) contract number W912P2-18-D-0041</u>:

| Date | Description |
|---|---|
| September 19, 2018 | Jean Yates founds L&J. |
| September 30, 2018 | KOMAN is awarded a POCA IDIQ contract by the Department of Defense (DoD), Army Corps of Engineers (ACOE), contract number W912P2-18-D-0041, to provide a facilities upgrade at the Yuma Proving Grounds in Yuma, Arizona. The contract award totaled $2,000,000.00, and the task order, number W912P2-18F-0184, totaled $249,888.00. |
| April 10, 2019 | Robert Yates approves a subcontract award to L&J in the amount of $110,019.18 for work on the Yuma DoD prime contract. *See* exhibit 4 (April 10, 2019 subcontract between KOMAN and L&J). |

### d. DoD ACOE Contracts – El Paso CPC Modular Project

68.     The following timeline summarizes key events related to KOMAN's improper subcontract award to L&J to perform work on <u>DoD ACOE contract numbers W9126G-19C-0025 and W9126G-19C-0027</u>:

| Date | Description |
|------|-------------|
| May 6, 2019 | KOMAN is awarded DoD ACOE contract number W9126G-19C-0025 to perform work on the El Paso CPC Modular Project in El Paso, Texas. The contract award totaled $21,884,014.91. *See* exhibit 5 (Contract Award, Specifications & Drawings and Solicitation, Offer, and Award for contract number W9126G-19C-0025). |
| May 10, 2019 | KOMAN is awarded DoD ACOE contract number W9126G-19C-0027 to perform work on the El Paso Modular Project. The contract award totaled $15,282,372.23. *See* exhibit 6 (May 10, 2019 El Paso Modular Project Prime Contract, no. W9126G-19C-0027). |
| May 22, 2019 | Contract number W9126G-19C-0025 is modified. *See* exhibit 7 (May 22, 2019 modification A00001 to contract number W9126G-19C-0025). |
| June 10, 2019 | Contract number W9126G-19C-0025 is modified. *See* exhibit 8 (June 10, 2019 modification P00001 to contract number W9126G-19C-0025). |
| July 12, 2019 | Contract number W9126G-19C-0025 is modified, and the contract's award is increased by $241,456.00, bringing the award's total value to $22,125,470.91. *See* exhibit 9 (July 12, 2019 modification A00002 to contract number W9126G-19C-0025). |
| July 30, 2019 | KOMAN approves a subcontract award to L&J for window installation as part of prime contract no. W9126G-19C-0027. *See* exhibit 10 (Statement and Acknowledgement for subcontract number FTW-ELP-0027-08000). |
| August 9, 2019 | Contract number W9126G-19C-0025 is modified. *See* exhibit 11 (August 9, 2019 modification P00002 to contract number W9126G-19C-0025). |
| September 3, 2019 | Contract number W9126G-19C-0025 is modified, and the contract's award is increased by $365,556.93, bringing the award's total value to $22,491,027.84. *See* exhibit 12 (September 3, 2019 modification A00003 to contract number W9126G-19C-0025). |

19

| Date | Description |
|------|-------------|
| September 18, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $2,318.65, bringing the award's total value to $22,493,346.49. *See* exhibit 13 (September 18, 2019 modification A00004 to contract number W9126G-19C-0025). |
| September 20, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $36,159.64, bringing the award's total value to $22,529,506.13. *See* exhibit 14 (September 20, 2019 modification A00005 to contract number W9126G-19C-0025). |
| September 24, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $44,781.17, bringing the award's total value to $22,574,287.30. *See* exhibit 15 (September 24, 2019 modification A00006 to contract number W9126G-19C-0025). |
| September 30, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $65,767.65, bringing the award's total value to $22,640,054.95. *See* exhibit 16 (September 30, 2019 modification A00007 to contract number W9126G-19C-0025). |
| October 30, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $410,000.00, bringing the award's total value to $23,080,996.96. *See* exhibit 17 (October 30, 2019 modification P00003 to contract number W9126G-19C-0025). |

**B.    KOMAN has not supervised or meaningfully participated in projects subcontracted to Donley Construction.**

69.    KOMAN has been nothing more than a front for subcontractor Donley Construction on multiple contracts.

70.    For example, during the bidding process for a contract to perform work on Bolling Air Force Base (contract no. W9127S-18C-6002), which was awarded September 12, 2018 in the amount of $1,420,410.00, KOMAN was hands-off. Donley substantially completed everything during the process. Furthermore, KOMAN had no personnel on site during the project, and Donley managed and completed all the work. KOMAN was required to have an onsite Program Manager and materially participate in the oversight of the prime contract, and it failed to do so.

71.     KOMAN was also completely hands-off during the bidding process for a Navy contract to perform work at Joint Base Anacostia-Bolling in Washington DC (contract no. N4008019D1603), which was awarded to KOMAN on May 1, 2019 in the amount of $2 million per year for up to 5 years (total of $10,000,000.00). Donley completely handled the bidding process for this contract, and KOMAN failed to provide any program management or oversight once the contract was awarded.

72.     KOMAN instead entered into a written agreement to hire one or two Donley personnel to manage this contract and paid Donley's accountant as a "consultant" to handle the books. *See* exhibit 18 (February 18, 2019 "Teaming Agreement" between KOMAN and Donley); *see also* exhibit 19 (July 2, 2019 e-mail chain regarding allocating compensation). Furthermore, the parties agreed to "settle up" and split the profits at the end of each contract year. *See* exhibit 20 (July 10, 2019 e-mail from Robert Kyrklund).

73.     KOMAN was awarded an additional contract (no. N400802-C0011), valued at $890,089.95, to renovate locker rooms at Joint Base Anacostia-Bolling, but Donley is the company actually performing the work on the contract, not KOMAN.

74.     KOMAN was recently awarded another five-year contract valued at $10 million to perform work at the Naval Academy in Annapolis, Maryland (contract no. N4008020R3502). KOMAN subcontracted with Donley, and as with the other contracts, Donley is the company actually performing the work.

**C.     Defendants have engaged in complementary bidding, bid rigging, and other collusive activities.**

**1.     DHS Contract No. 70B01C19D00000067**

75.     Defendants have defrauded the Government on multiple contracts. For example, on August 30, 2019, KOMAN was awarded a DHS contract to repair and improve services for TI

assets in the Tucson sector (contract no. 70B01C19D00000067), which was a year-long, sole-source IDIQ contract. The award totaled $21,495,528.32.

76.     KOMAN subcontracted to a sister company, SWP Contracting. During the bidding process, SWP put the subcontract together, and KOMAN then signed it at Robert Yates' direction. The CBP Program Manager believed that SWP was overcharging on work orders, and KOMAN Program Manager, Allen Sander, expressed his concerns about SWP overcharging on the contract to Robert Yates. Relator Gomez also discussed the overcharges with Mr. Yates and Mr. Sander. Yates responded that the overcharges were not a problem, because all funds flowing into SWP ultimately flowed into the parties' parent company, NOK, benefitting everyone's bottom line.

77.     Another subcontractor on the project, Cerrudo, worked for KOMAN through SWP and charged far less than SWP. Had KOMAN subcontracted directly with Cerrudo, or with other companies with lower rates, KOMAN would have saved the Government money. Instead, even though KOMAN knew that it was getting overcharged by SWP, it did nothing about it.

78.     KOMAN also won the following contracts and subcontracted work to SWP, despite SWP's overcharges:

| Date Signed | Value | Contract No. | Description |
|---|---|---|---|
| June 4, 2020 | $20,773,086 | 70B01C20D00000018 | CTIMR PROGRAM COVERING SCHEDULED AND UNSCHEDULED MAINTENANCE ACTIVITIES IN RIO GRANDE VALLEY SECTOR |
| June 16, 2020 | $11,287,593 | 70B01C20D00000022 | COMPREHENSIVE TACTICAL INFRASTRUCTURE MAINTENANCE AND REPAIR PROGRAM COVERING LAREDO SECTOR |

| Date Signed | Value | Contract No. | Description |
|---|---|---|---|
| June 24, 2020 | $13,648,346 | 70B01C20D00000023 | COMPREHENSIVE TACTICAL INFRASTRUCTURE MAINTENANCE AND REPAIR (CTIMR) PROGRAM COVERING THE DEL RIO AND SOUTH BIG BEND SECTORS |

**2. Tyndall Air Force Base (contract no. W9127819C0044)**

79. Robert Kyrklund is now the General Manager at KOMAN, and Robert Yates is the General Manager of KOMAN Advantage (KA). KOMAN developed KA as a standalone company that operates as an "in-house" electrical division. KOMAN and KA had an arrangement whereby all electrical work KOMAN received was subcontracted to KA.

80. For example, a contract for work at Tyndall Air Force Base (contract no. W9127819C0044) was awarded to KOMAN on September 29, 2019 in the amount of $7,791,800.69. Relator Christopher Hicks was the Project Manager on the Tyndall Air Force Base contract, and he had an electrical subcontractor, Weaver Electric, that he had worked with for many years. Mr. Hicks invited Jeremy Holland at Weaver to submit a bid for the electrical portion of the project. Mr. Holland came to Tyndall, along with other subs and the design team, to learn about the project and assist the design team with the design. He worked with the design team and spent many hours developing a proposal for the electrical portion of the project.

81. In the meantime, Mr. Yates was working to form KA. As soon as KA was formed, KOMAN subcontracted the electrical work on the project to KA. Tom Berrett, KOMAN Executive Program Manager and Mr. Hicks' supervisor, later told Mr. Hicks that the award to KA was for a larger amount than the proposal from Weaver.

23

82.     Furthermore, during the bidding process for the Tyndall Air Force Base contract, the Government requested that KOMAN supply additional documentation to validate bid numbers from other subcontractors or provide letters from subcontractors declining to bid. KOMAN arranged for, received, and submitted letters from L&J, BFL, and HWH, all declining to bid. The declination letter from L&J was authored by Robert Yates.

### 3.     KA subcontracts to KOMAN.

83.     KOMAN and KA have a new arrangement in which KA is the prime contractor and subcontracts work to KOMAN. For example, KA was awarded a contract to perform work at Fort Huachuca (contract no. W19RUS20P0069), and it gave KOMAN a subcontract for $1,310,458.00.

84.     As another example, the National Oceanic and Atmospheric Administration (NOAA) in Miami awarded a contract to KOMAN and has offered multiple others. NOAA sent KOMAN an RFP on August 28, 2020. Matthew Yates decided to talk to the Contracting Officer to try to get the contract shifted to KA, so that KA could then subcontract work to KOMAN. KA and KOMAN are colluding to build in two layers of profit and overhead for no reason other than greed.

### D.     KOMAN paid for expensive outings with contractors and subcontractors.

85.     KOMAN also exerted improper influence over the contracting process by treating other contractors to expensive outings. KOMAN provided these gratuities as an inducement to co-conspirators necessary for the continuation of multiple complementary bid schemes. For example, KOMAN paid for the following fishing trips:

| Date | Location | KOMAN Attendees | Contractor | Contractor Attendees |
|---|---|---|---|---|
| Summer 2018 | Sitka, Alaska | Bruce Beck<br>Robert Yates | HWH | Randal Stanley<br>Tim Glenn |

| Date | Location | KOMAN Attendees | Contractor | Contractor Attendees |
|---|---|---|---|---|
| | | | | Charles Cayton |
| Fall 2018 | Munds Park, Arizona | Robert Yates | L&J<br><br>BFL | Jean Yates<br><br>Ricky Robinson and wife |
| Jan 2019 | Honolulu, Hawaii | Robert Yates | L&J<br><br>Zapata[4] | Jean Yates<br><br>Shane Smith<br>Brett Butler |
| Summer 2019 | Seward, Alaska | Robert Yates<br>Robert Kyrklund<br>Zigmund Peacock<br>Grant Ellingson and wife | BFL<br><br>L&J<br><br>Ross & Barruzini[5] | Ricky Robinson<br><br>Lucas Robinson<br><br>Mike Shea |

86.     Robert Yates and Robert Kyrklund have also attended events hosted by subcontractors, and in addition to the fishing trips, Mr. Yates and Mr. Kyrklund purchased a suite for $170,000 in early 2020 at Gila River Arena to use for entertaining subcontractors, including BOXX, which subcontracted with KOMAN on a project for Hill Air Force Base. KOMAN hosted BOXX at an event at the arena on February 6, 2020. KOMAN also hosted a ski trip for BOXX employees and attended a hockey game with BOXX employees in February 2020.

---

[4] Zapata is an engineering firm that KOMAN has worked for as a subcontractor.

[5] Ross & Barruzini (R&B) is an engineering firm that KOMAN does business with regularly. R&B, which has a corporate office in St. Louis, is considered to be KOMAN's primary design firm, and works with KOMAN on the Tyndall Air Force Base contract.

## IX. KOMAN'S RETALIATION AGAINST RELATORS

**A.    KOMAN unlawfully retaliated against Relator Christopher Hicks.**

87.    Relator Christopher Hicks has managed projects at KOMAN for several years and has witnessed KOMAN's fraud up close on many occasions. Mr. Hicks has refused to participate in KOMAN's fraudulent behavior and has spoken up about it and tried to stop it multiple times. As a result, Mr. Hicks' superiors have been waging a campaign of retaliation against him.

88.    The retaliation against Mr. Hicks began in March 2020. On February 26, 2020, Grant Ellingson, Accounting Manager at KOMAN Holdings, contacted Mr. Hicks' immediate supervisor, KOMAN Executive Program Manager Tom Berrett, and told him to complete a questionnaire regarding the Joint Base Anacostia-Bolling (JBAB) contract for KOMAN's 2019 financial statement audit. *See* exhibit 21 (February and March 2020 emails with subject line "Mini-JOC (Job 10019) – Executed Base Contract and PM Questionnaire"). Mr. Berrett then asked Mr. Hicks to complete the questionnaire.

89.    On March 3, 2020, Mr. Hicks called Mr. Berrett and told him he could not complete the questionnaire for reasons that Mr. Berrett understood. The main reason that Mr. Hicks could not complete the questionnaire is that KOMAN was not truly managing the project as its subcontractor, Donley, handled all aspects of the project. Mr. Hicks then sent an email to Mr. Berrett following up on the phone call and telling him that he could not accurately complete the questionnaire due to his lack of time at JBAB and "other extenuating circumstances." *Id.* On March 4, 2020, the questionnaire was completed by Donley employees, and Tom Berrett subsequently sent it to corporate. *See* exhibit 22 (March 4, 2020 e-mail with subject line "Financial Audit from Corporate").

90.     Mr. Hicks also spoke up about fraud related to the Tyndall Air Force Base project, for which he was the Project Manager. KOMAN subcontracted the electrical work to KA, but Matthew Yates told Mr. Hicks and his team to complete a light count, which involved reviewing the plans in the contract and counting the lights that required replacement per the contract plans. Mr. Hicks told Mr. Berrett that KA should do the light count, because KA had the contractual obligation and should assume the risk, and Mr. Hicks' team was not qualified for the task. Mr. Berrett told Mr. Hicks to get the light count or else he would be looking for a job. Chad Thompson, one of Mr. Hicks' subordinates, provided Mr. Hicks with a light count, which Mr. Hicks then forwarded to Matthew Yates. Mr. Yates called Mr. Hicks and threatened his job, telling him the light count was incorrect. Robbie Kyrklund and Ricky Robinson were present for the call.

91.     The abusive call from Mr. Yates was the last straw. On March 13, 2020, Mr. Hicks sent a formal complaint against Mr. Yates to Jim Erickson, President and CEO of KOMAN Holdings, Mike Taylor, Safety Director of KOMAN Holdings, and Mr. Berrett. *See* exhibit 23 (March 13, 2020 e-mail with subject "Formal Complaint against Matthew Yates and Natives of Kodiak"). Immediately after reading Mr. Hicks' complaint, Mr. Berrett called Mr. Hicks and asked him if he was a "f***ing idiot." Mr. Hicks then contacted HR. *See* exhibit 24 (March 13, 2020 e-mail from Allyson Thomas to Christopher Hicks).

92.     On March 16, 2020, Mr. Hicks spoke with Allyson Thomas in HR, and he described his hostile and retaliatory work environment, which also included his superiors using racial slurs. He gave Ms. Thomas a list of witnesses, including Relator Angela Gomez. He also provided a list of positions for which he was not considered, because he was never told about the openings. *See* exhibit 25 (March 23, 2020 e-mail from Christopher Hicks to Allyson Thomas).

93. On March 30, 2020, Ms. Thomas informed Mr. Hicks that her investigation was complete, even though she did not interview all of his witnesses, including Ms. Gomez. Mr. Hicks questioned the thoroughness of the "investigation" and asked how he was supposed to work in such a hostile environment. Ms. Thomas responded by sending Mr. Hicks a flyer for the Employee Assistance Program, telling him that he could use the program as a resource to learn to manage "difficult conversations." *See* exhibit 26 (E-mail from Allyson Thomas to Christopher Hicks attaching EAP flyer); *see also* exhibit 27 (EAP flyer). Thus, in response to his complaints about the hostility he regularly received for not participating in fraud, Mr. Hicks was told he needed to improve his communication skills. Mr. Hicks inquired further, and on April 1, 2020, Ms. Thomas reiterated that her investigation did not "provide evidence of a hostile and discriminatory work environment."

94. *One day later*, on April 2, 2020, Mr. Berrett told Mr. Hicks that he was being taken off the Tyndall Air Force Base project. On April 3, 2020, Deena Hardin with HR and Mr. Berrett told Mr. Hicks that he was being placed on a Performance Improvement Plan (PIP). Ms. Hardin told Mr. Hicks that he was not performing in accordance with his job description. Mr. Hicks told her that when he started with KOMAN in September 2016, there was no job description, and he had never been made aware of one. On April 4, 2020, Mr. Hicks sent an e-mail to Mike Taylor, Jim Erickson, and Tom Berrett complaining about the retaliatory treatment he was being subjected to because of his formal complaint. *See* exhibit 28 (April 4, 2020 e-mail from Christopher Hicks to Mike Taylor, Jim Erickson, and Tom Berrett).

95. Mr. Hicks received a copy of the PIP on April 6th, and he saw that it was dated April 2nd. *See* exhibit 29 (April 2, 2020 Performance Improvement Plan for Christopher Hicks). The PIP criticized Mr. Hicks' ability to handle complex projects, which was untrue, as demonstrated by the

fact that KOMAN has kept Mr. Hicks on the NOAA projects.[6] Mr. Hicks immediately sent an e-mail to Mike Taylor, Jim Erickson, and Tom Berrett regarding the original complaint, the bogus investigation, and the resulting retaliation. Mr. Erickson then called Mr. Hicks and said he did not contact him earlier, because he did not want to appear biased during the investigation. Mr. Hicks respectfully disagreed with the investigation and Mr. Erickson's decisions during the phone call and in a subsequent e-mail exchange. *See* exhibit 30 (April 6, 2020 e-mail exchange between Christopher Hicks and Jim Erickson).

96.     The allegations against Mr. Hicks in terms of job performance were meritless, and the PIP was an attempt to silence and punish him for refusing to participate in KOMAN's fraud. For example, the PIP states that Mr. Hicks was to be evaluated on all of his projects 30, 60, and 90 days after signing the PIP, but Mr. Hicks has not been evaluated to date. Furthermore, the PIP states that Mr. Hicks was to participate in weekly calls regarding progress on all of his projects, but those weekly calls have not taken place. The fact that KOMAN has not met the terms of its own PIP indicates that it was not truly implemented for the purpose of correcting Mr. Hicks' performance and was instead implemented for purely retaliatory reasons.

97.     In June 2020, Mr. Hicks prepared a proposal for a complex project at a facility owned by the National Oceanic and Atmospheric Administration (NOAA). Prior to submitting it, Mr. Hicks had several conversations with the Contracting Officer, Chris Mackie, regarding the organization of the proposal, because Mr. Hicks was concerned that KOMAN's proposal would look unnecessarily complicated if organized as NOAA requested. Mr. Mackie told Mr. Hicks to

---

[6] In fact, Mr. Berrett e-mailed Mr. Hicks on September 21, 2020 and told him that he knew KOMAN would get more contracts with NOAA if Mr. Hicks was the lead on the project. *See* exhibit 34 (September 21, 2020 e-mail from Tom Berrett to Christopher Hicks).

deliver the information in a format that would be easier to comprehend, which Mr. Hicks did. KOMAN submitted the proposal on June 5, 2020.

98.     Mr. Hicks' superiors told him that the format of the proposal was incorrect and refused to listen to him when he tried to explain that he and Mr. Mackie had discussed the organization of the proposal and that Mr. Hicks' understanding was that he could organize it in a way that was easier to comprehend. Mr. Hicks contacted Mr. Mackie about it on June 10, 2020, and Mr. Mackie asked him to resubmit the proposal using the format originally requested. *See* exhibit 31 (June 10, 2020 e-mails with subject "AOML Hurricane Repairs").

99.     On June 20, 2020, Tom Berrett and a KOMAN HR representative, Deena Hardin, called Mr. Hicks and told him he was being demoted to Project Manager. They refused to give Mr. Hicks a reason and then told him that his projects were now limited to the NAS Jacksonville project, any work at NAS Belle Chasse, and the NOAA projects in Miami. On June 22, 2020, Mr. Hicks sent an e-mail to follow up on their conversation and told him he understood that he was now only responsible for employees working on the NAS Jacksonville project or the NOAA projects in Miami, even though there were "no other employees assigned to these projects as of 6/22/20." *See* exhibit 32 (June 22, 2020 e-mails with subject "Demotion Questions"). Mr. Berrett confirmed that Mr. Hicks would only have a few projects going forward and that he would not have anyone to supervise. *Id.*

100.    In August 2020, Mr. Hicks learned that Mr. Mackie was no longer the Contracting Officer on the NOAA projects. A NOAA employee called Mr. Hicks on August 24, 2020 and told him that the proposal KOMAN submitted on June 5, 2020 was difficult to comprehend, confirming the validity of the concerns Mr. Hicks had previously raised. Mr. Hicks explained that he had initially sent a different version he thought was easier to understand, and the employee asked him

to send that version to the new Contracting Officer, Tania Gates. Mr. Hicks asked Mr. Berrett's permission to send the original version, telling him that he had been giving him grief for no reason considering that NOAA now wanted the original proposal. Mr. Berrett gave Mr. Hicks permission to send the proposal, which Mr. Hicks did on August 25, 2020. *See* exhibit 33 (August 25, 2020 e-mail from Mr. Hicks to Tania Gates).

101. Mr. Hicks' superiors have continued to retaliate against Mr. Hicks and badger him for his supposedly poor job performance; however, Mr. Hicks has been an exemplary employee and has had multiple accomplishments since his demotion. For example, he has been instrumental in securing more awards from NOAA, and he completed a project at NAS Jacksonville, a client he brought in with no help from anyone at KOMAN. Mr. Hicks finished the project on time and under budget. Mr. Hicks was also told recently that KOMAN would get another project from NAS Belle Chasse in the fall for the final stage of the hangar 3 window replacement. Mr. Hicks' superiors' accusations of poor job performance are meritless.

102. Furthermore, the proposals that KOMAN has sent NOAA since Mr. Hicks' demotion have been sloppy and filled with misspelled words and language from proposal templates that should have been deleted. The fact that KOMAN allows Mr. Hicks' replacement to submit such slipshod work is further proof that KOMAN did not demote him for job performance.

103. KOMAN has spent months retaliating against Mr. Hicks because he has spoken up about fraud and refused to participate in it. His superiors have harassed and demoted him and continue to do so.

## B. KOMAN unlawfully retaliated against Relator Angela Gomez.

104. Relator Angela Gomez was hired by KOMAN in October 2017 and served as Business Manager until her constructive discharge on July 9, 2020.

105.     Ms. Gomez was subjected to sex discrimination, a hostile work environment, and retaliation while working for KOMAN. The retaliation stemmed from Ms. Gomez's complaints that KOMAN's discriminatory hiring and employment practices violated the terms of its federal contracts, which prohibit KOMAN from discriminating against women and minorities as a condition of receiving federal funds.

106.     Mr. Kyrklund and Mr. Yates commented on multiple occasions that "girls shouldn't be in construction," and they subjected female employees, including Ms. Gomez, to a hostile work environment. Women were excluded from company events and were denied raises and promotions. Mr. Yates and Mr. Kyrklund also made racially discriminatory comments and harassed an employee for his religious beliefs.

107.     KOMAN's hiring practices were also discriminatory. For example, in July 2019, Mr. Kyrklund interviewed a woman for a Project Manager position. He told Ms. Gomez that the candidate was highly qualified, but that he wanted to make her an office assistant instead. Ms. Gomez protested that the woman had applied for a managerial position and should have a managerial title. Mr. Kyrklund instead hired the woman as "Bid Coordinator" and gave her the same responsibilities as a manager.

108.     Ms. Gomez complained about management's discriminatory practices and hostile work environment multiple times. For example, on February 14, 2020, Ms. Gomez reached out to KOMAN human resources representative Deena Hardin. Ms. Gomez expressed her concerns about gender bias, discrimination against minorities and women, and KOMAN's lack of compliance with federal law and the terms of federal contracts.

109.     On February 19, 2020, Mr. Kyrklund and Mr. Yates pulled Ms. Gomez into a meeting and accused her of showing favoritism to women and "making a big deal" out of "veteran

and female issues." Ms. Gomez advised Mr. Yates and Mr. Kyrklund that these were contract compliance issues, because KOMAN was contractually required to do all it could to promote women, minorities, and veterans. Mr. Kyrklund sat there and smirked and said things were fine. Mr. Yates then told Ms. Gomez that some of her job duties were being removed and that Deena Hardin from HR would take over as Office Manager.

110.    Later that day, Ms. Gomez spoke with Aronca Robinson, Corporate Compliance Manager for KOMAN Holdings, and told Ms. Robinson about the gender bias and lack of contract compliance. Ms. Robinson confirmed that there was a concern. Ms. Gomez also emailed Ms. Robinson on February 20, 2020 and asked her to pursue her concerns on a higher level. Ms. Robinson confirmed during a subsequent call that she had received the e-mail and would follow up with Jim Erickson, NOK's CEO. A couple of weeks later, raises were given to Ms. Gomez's co-workers, but not Ms. Gomez.

111.    On March 24, 2020, Ms. Gomez was pulled into another hostile meeting with Mr. Yates, Mr. Kyrklund, and Ms. Hardin. They accused Ms. Gomez of being confrontational during executive meetings and of "having issues" with Ms. Hardin. Ms. Gomez told them that their real problem with her was that she would not "shut up" about the discrimination. Ms. Gomez was written up after the call.

112.    On April 2, 2020, Ms. Gomez contacted Mr. Erickson and again expressed her concerns about discrimination and KOMAN's compliance with the terms of its federal contracts, and Mr. Erickson advised that he would have Amanda from HR follow up on the issue. Mr. Erickson also advised that he would relay Ms. Gomez's concerns to Tracy Kerns, COO of KOMAN Holdings.

113.    Ms. Gomez spoke with Amanda from HR on April 7, 2020 and April 22, 2020, and Amanda promised during each call that she would follow up on Ms. Gomez's concerns, but she never did.

114.    The retaliation continued to worsen, and Ms. Gomez hired an attorney. Her attorney sent a letter to Mr. Erickson on April 24, 2020 regarding the retaliatory and discriminatory conduct she had been subjected to, and Ms. Gomez was then placed on administrative leave. KOMAN's retaliation against Ms. Gomez continued even while she was on leave. On May 15, 2020, one of Ms. Gomez's family members was fired, and another family member was continually harassed.

115.    On May 29, 2020, Ms. Gomez was told that the investigation was complete and that she should return to work, which she did on June 1, 2020. The day after her return, Ms. Gomez was hauled into a meeting with Tracy Kerns, harassed about a family business, Steve Gomez Installation (SGI), and told that her association with the business was supposedly a conflict of interest. The accusation was meritless: SGI was essentially an entity in name only, had not performed work in years, and did not even have a bank account, as her father had decided that he was no longer interested in having the business. Furthermore, KOMAN's management knew about SGI when Ms. Gomez was hired, as she had included her family's business on her resume.

116.    On June 3, 2020, Ms. Gomez was subjected to yet another hostile meeting, this time about another alleged conflict of interest. The meetings and accusations were nothing more than an effort to intimidate Ms. Gomez for requesting an investigation into KOMAN's discriminatory practices. Ms. Gomez was not fired but was told that she should not return to work, and she was forced to use her PTO. While Ms. Gomez was on leave, KOMAN refused to give verbal employment verification to a mortgage provider, even though Ms. Gomez was still employed.

117.     Several weeks after the meeting, Ms. Gomez informed KOMAN in a letter that no reasonable employee could continue to work at KOMAN after experiencing discrimination and retaliation based on raising concerns about sex discrimination, unequal pay based on sex, and KOMAN's unlawful contracting practices. Ms. Gomez was constructively discharged on July 9, 2020.

118.     KOMAN's management repeatedly violated federal laws prohibiting discrimination, as well as the terms of the contracts at issue in this case, which require compliance with anti-discrimination laws. Ms. Gomez suffered harassment, retaliation, and financial and emotional harm due to her efforts to stop KOMAN's rampant, and illegal, discrimination.

## X.     ACTIONABLE CONDUCT BY DEFENDANTS

### A.     False Claims Act

#### 1.     Applicable Law

119.     This is an action to recover damages and civil penalties on behalf of the United States and Relators arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

120.     The FCA provides that any person who

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
>
> (C)     conspires to defraud the Government by committing a violation of [the FCA]

is liable to the Government for a civil penalty of not less than $11,665 and not more than $23,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

121. The FCA defines "claim" as:

(A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the money   or   property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

122.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects whistleblowers who have suffered retaliation because of their efforts to stop one or more violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

123.     Based on these provisions, Relators, on behalf of the United States and on their own behalf, seek through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**2.   Defendants' Violations of the False Claims Act**

**a.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

124.     From 2015 to the present, Defendants have knowingly presented false or fraudulent claims associated with multiple federal contracts, including those specified herein.

125.    Specifically, Defendants have engaged in bid rigging and awarded subcontracts without fair competition. Rather than awarding subcontracts to companies that offered the best value to the Government, Defendants KA and KOMAN instead selected companies that did not, even taking turns subcontracting with one another. Furthermore, KOMAN and KA have failed to supervise or meaningfully participate in projects subcontracted to Donley. Defendants also paid and/or received kickbacks in an effort to exert undue influence over the contracting process.

126.    The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors to secure preferential treatment within the FAR-regulated contracting process. The illicit award of a subcontract to an improperly-vetted vendor in an attempt to enrich oneself is considered "anything of value" and constitutes a kickback under the Anti-Kickback Act. Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

127.    Defendants' interference with the contracting process and other collusive activities that run afoul of FAR also violated the False Claims Act. Companies are required to comply with FAR when bidding on contracts and performing contracts.

128.    FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

129.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make

payments for services that it would not have made had it known the companies performing these services were offering or receiving kickbacks and/or were colluding during the bidding process.

130. Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' failure to comply with FAR, as well as Defendants' corrupt provision and/or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

131. Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the potential to influence the payment decisions of the Government. Because of their fraudulent representations, Defendants earned millions of dollars to which they were not legitimately entitled. The ultimate submission to the Government of false claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.

132. By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

  **b. Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

133. From 2015 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly and impliedly, that their statements were true, accurate, and correct.

134.    Defendants' express and implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

135.    Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. All of these certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind contracts or subcontracts.

136.    Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### c.    Conspiracy (31 U.S.C. § 3729(a)(1)(C))

137.    By planning and implementing their schemes, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

138.    FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

39

139.     Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of kickbacks in exchange for business and was material to the Government's loss.

140.     Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

141.     Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

**B.     Defendants' Retaliation Against Relators**

142.     Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

> (1)   Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

> (2)   Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

143.    As discussed *supra*, KOMAN retaliated against Relators because of their efforts to stop KOMAN from defrauding the Government in violation of the False Claims Act.

144.    Relators have suffered economic loss and sustained special damages because of Defendants' retaliatory acts and are entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XI.    CAUSES OF ACTION

### A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

145.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

146.    From 2015 to the present, Defendants have knowingly presented false or fraudulent claims associated with multiple federal contracts, including those specified herein.

147.    Specifically, Defendants have engaged in bid rigging and awarded subcontracts without fair competition. Rather than awarding subcontracts to companies that offered the best value to the Government, Defendants KA and KOMAN instead selected companies that did not, even taking turns subcontracting with one another. Furthermore, KOMAN and KA have failed to supervise or meaningfully participate in projects subcontracted to Donley. Defendants also paid and/or received kickbacks in an effort to exert undue influence over the contracting process.

148.    The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors to secure preferential treatment within the FAR-regulated contracting process. The illicit award of a subcontract to an improperly-vetted vendor in an attempt to enrich oneself is considered "anything of value" and constitutes a kickback under the Anti-Kickback Act. Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

149.    Defendants' interference with the contracting process and other collusive activities that run afoul of FAR also violated the False Claims Act. Companies are required to comply with FAR when bidding on contracts and performing contracts.

150.    FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

151.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make payments for services that it would not have made had it known the companies performing these services were offering or receiving kickbacks and/or were colluding during the bidding process.

152.    Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' failure to comply with FAR, as well as Defendants' corrupt provision and/or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

153.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the potential to influence the payment decisions of the Government. Because of their fraudulent representations, Defendants earned millions of dollars to which they were not legitimately entitled.

The ultimate submission to the Government of false claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.

154. The United States paid the false or fraudulent claims.

155. By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.** **Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

156. Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

157. From 2015 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly and impliedly, that their statements were true, accurate, and correct.

158. Defendants' express and implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

159. Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. All of these

certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind contracts or subcontracts.

160.    Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

161.    The United States paid the false or fraudulent claims.

162.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**C.      Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C))**

163.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

164.    By planning and implementing their schemes, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

165.    FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

166.    Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of kickbacks in exchange for business and was material to the Government's loss.

167. Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

168. Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

169. The United States paid the false or fraudulent claims.

170. By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

171. WHEREFORE, Relators respectfully request that the Court enter judgment against the Defendants and award the following:

    (1) Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

    (2) Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

    (3) The maximum award Relators may recover pursuant to 31 U.S.C. § 3730(d);

    (4) All costs and expenses of this litigation, including attorneys' fees and costs of court; and

    (5) All other relief on behalf of Relators or the United States that the Court deems just and proper.

**D.      Count IV – Retaliation (31 U.S.C. § 3730(h))**

172.      Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

173.      In violation of 31 U.S.C. § 3730(h), Defendants retaliated against Relators because of lawful acts they conducted in furtherance of efforts to stop Defendants from committing violations of the False Claims Act.

174.      Relators have suffered economic loss and special damages because of Defendants' retaliatory acts and are entitled to relief pursuant to 31 U.S.C. § 3730(h).

**PRAYER FOR RELIEF**

175.      Relators pray that the Court enter judgment against Defendants for the following:

(1)   Two times the amount of Relators' back pay;

(2)   Interest on Relators' back pay;

(3)   Compensation for special damages sustained by Relators as a result of Defendants' actions;

(4)   Litigation costs and attorney fees; and

(5)   Any other relief the Court deems just and proper to make the Relators whole.

**XII.    DEMAND FOR JURY TRIAL**

176.      Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury.

**XIII.    DOCUMENTARY EVIDENCE**

177.      The following documentary evidence is referenced herein:

| Exhibit No. | Description |
|---|---|
| 1 | L&J October 9, 2019 Annual Report |
| 2 | November 1, 2018 subcontract between KOMAN and L&J |
| 3 | December 19, 2018 subcontract between KOMAN and L&J |
| 4 | April 10, 2019 subcontract between KOMAN and L&J |

| Exhibit No. | Description |
|---|---|
| 5 | Contract Award, Specifications & Drawings and Solicitation, Offer, and Award for contract number W9126G-19C-0025 |
| 6 | May 10, 2019 El Paso Modular Project Prime Contract, no. W9126G-19C-0027 |
| 7 | May 22, 2019 modification A00001 to contract number W9126G-19C-0025 |
| 8 | June 10, 2019 modification P00001 to contract number W9126G-19C-0025 |
| 9 | July 12, 2019 modification A00002 to contract number W9126G-19C-0025 |
| 10 | Statement and Acknowledgement for subcontract number FTW-ELP-0027-08000 |
| 11 | August 9, 2019 modification P00002 to contract number W9126G-19C-0025 |
| 12 | September 3, 2019 modification A00003 to contract number W9126G-19C-0025 |
| 13 | September 18, 2019 modification A00004 to contract number W9126G-19C-0025 |
| 14 | September 20, 2019 modification A00005 to contract number W9126G-19C-0025 |
| 15 | September 24, 2019 modification A00006 to contract number W9126G-19C-0025 |
| 16 | September 30, 2019 modification A00007 to contract number W9126G-19C-0025 |
| 17 | October 30, 2019 modification P00003 to contract number W9126G-19C-0025 |
| 18 | February 18, 2019 "Teaming Agreement" between KOMAN and Donley |
| 19 | July 2, 2019 e-mail chain regarding allocating compensation |
| 20 | July 10, 2019 e-mail from Robert Kyrklund |
| 21 | February and March 2020 emails with subject line "Mini-JOC (Job 10019) – Executed Base Contract and PM Questionnaire" |
| 22 | March 4, 2020 e-mail with subject line "Financial Audit from Corporate" |
| 23 | March 13, 2020 e-mail with subject "Formal Complaint against Matthew Yates and Natives of Kodiak" |
| 24 | March 13, 2020 e-mail from Allyson Thomas to Christopher Hicks |
| 25 | March 23, 2020 e-mail from Christopher Hicks to Allyson Thomas |
| 26 | E-mail from Allyson Thomas to Christopher Hicks attaching EAP flyer |
| 27 | EAP flyer |
| 28 | April 4, 2020 e-mail from Christopher Hicks to Mike Taylor, Jim Erickson, and Tom Berrett |
| 29 | April 2, 2020 Performance Improvement Plan for Christopher Hicks |
| 30 | April 6, 2020 e-mail exchange between Christopher Hicks and Jim Erickson |
| 31 | June 10, 2020 e-mails with subject "AOML Hurricane Repairs" |
| 32 | June 22, 2020 e-mails with subject "Demotion Questions" |
| 33 | August 25, 2020 e-mail from Mr. Hicks to Tania Gates |
| 34 | September 21, 2020 e-mail from Tom Berrett to Christopher Hicks |

Respectfully submitted,

**BERG & ANDROPHY**

_____
Joel M. Androphy
TX State Bar No. 01254700
Janis G. Gorton (Admission pending)
TX State Bar No. 24071063
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2020, I caused a true and correct copy of this Original Complaint to be served on the United States Department of Justice and the United States Attorney's Office in the Western District of Texas via certified mail, return receipt requested.

I further certify that on October 1, 2020, I caused a true and correct copy of this Original Complaint to be sent via electronic mail to William Barr, United States Attorney General, at Civilfrauds.quitams@usdoj.gov.

_____

Joel M. Androphy