# EXHIBIT 18

## TEAMING AGREEMENT

**THIS AGREEMENT,** effective as of February 18th 2019, between KOMAN Construction with an office at 2700 Gambell St Suite 401 Anchorage, AK 99503 (hereinafter "Company") and Donley Construction, with an office at 716 South Philadelphia, Blvd Aberdeen, MD 21001 (hereinafter "Teaming Partner"), concerns the cooperation of the parties in connection with the contemplated submission of proposals by the Company to the U.S. Government, U.S. Military and other private concerns (hereinafter "Clients or Customers"). Relative to such proposals and any prime contracts and Task Orders thereafter awarded by the Customers to the Company thereunder, the parties agree as follows:

## ARTICLE I. PROPOSAL ACTIVITIES

1.1 Each party will exert all reasonable efforts to prepare and submit proposals which will result in the selection of the Company as prime contractor to provide tasks required by the contract (the "Program work") and Teaming Partner as subcontractor to provide that portion of the Program work including, but not limited to, the following:

Project Management

Site Supervision

Supply of Designated Project Required Labor Materials and Equipment

Subcontractors and Subcontract Management

Operations and Scheduling

Other Services as Identified on a Project-by-Project Basis

1.2 Each party agrees to continue to exert all proper and reasonable efforts towards these objectives throughout negotiations concerning any prime contract and resultant subcontract that may result from the submission of such proposal.

1.3 The Company will have the responsibility for the preparation, content, evaluation, and submission of the combined management, technical, price, and cost proposal to the

Customer. Each party will supply, in a timely manner, all necessary engineering, management, technical, and other services, as well as cost and pricing information, exhibits, designs, and plans related to that portion of the Program work that it proposes to perform, so as to enable the Company to fully respond to the customer's proposal requirements. All contacts by Teaming Partner with the Customer pertaining to the proposal will be made through, or with the prior consent of, the Company.

1.4 Each party will bear all expenses that it incurs in connection with the proposal, negotiations that may follow, and all other efforts under this Agreement. Neither party will be liable for costs incurred or other obligations undertaken by the other party in connection with the proposal or any such negotiations.

1.5 The Company will keep Teaming Partner informed concerning preparations for, timing, and status of prime contract negotiations. Teaming Partner will support and participate in prime contract negotiations, as reasonably requested by the Company.

1.6 The parties recognize that, subsequent to the Agreement becoming effective, conditions relating to the Program may change such as to dictate a change in the Scope of Work in order to enhance the possibilities for selection of the Company as prime contractor for the Program and Teaming Partner as a subcontractor thereunder. Therefore, it is agreed that, after issuance of the request for proposal by the Customer and prior to the submission of the proposal by the Company, Teaming Partner will, upon the request of the Company, enter into good faith negotiations with the Company to revise the services listed in Part 1.1 hereinabove to increase or decrease the work thereunder. The Company agrees not to initiate such request, unless it has a good faith belief that such is necessary and will in such event advise Teaming Partner of the basis for such belief. In the event, after such the Company request, the parties are unable to reach mutual agreement as to an appropriate revision to the services listed in Part 1.1, either party may upon ten (10) days prior notice to the other party terminate this Agreement, unless within such ten (10) day period the Company withdraws the request or mutual agreement upon a revision is reached in which case the rights and obligations of both parties under this Agreement will terminate, except as expressly provided in Articles IV, VII and X hereof.

1.7 Teaming Partner shall submit, in a timely manner, its technical, costs, resumes, project descriptions, and management portions of the proposal, as requested by the Company.

1.8 At the Company's request, Teaming Partner shall make available qualified personnel, which will provide assistance in the preparation of the final proposal documents.

1.9 When necessary, or at the Company's request, Teaming Partner shall provide technical, financial, and management data and/or personnel to assist the Company in discussions and/or negotiations with the Customer relating to Teaming Partner's proposed work.

1.10 Teaming Partner shall provide assistance by all such other reasonable means as determined to be necessary and proper to support the proposal effort.

1.11 The Company shall not solicit from any other firm the contract work that Teaming Partner is proposed to perform unless the Customer will not approve Teaming Partner as a subcontractor. Teaming Partner agrees that during the term of this Teaming Agreement it will not participate in the submission of a competitive proposal in response to the Solicitation as a prime contractor, consultant, or as a subcontractor to any other firm(s) where there is a need to perform an 8(a) Business Development Program. This Teaming Agreement shall not preclude either Party from competing for, or contracting independently, from the other on any other government or industry program that may develop or arise in the general area of business related to the Solicitation.

## ARTICLE II. AWARD OF CONTRACT

If the Company is selected by the Customer as the prime contractor for the Program, the Company will offer to the Teaming Partner a Task Order (attached **Exhibit B**) for such services as set forth in a Master Subcontract Agreement (attached **Exhibit A**). Teaming Partner will work with Company in meeting its SBA "Self-Performance" Requirements as detailed in the attached **Exhibit C**. Any changes or supplements thereof shall be subject to applicable laws, regulations and terms of the prime contract, mutual agreement on pricing and other subcontract terms and conditions, and prior approval of the Customer,

if required. The Company will exert all reasonable efforts to secure any such required Customer approval.

The subcontract shall be negotiated at a fair and reasonable price to be established after cost or price analysis in accordance with standard industry practice or in accordance with the requirements and regulations of the Customer, where applicable. In the event mutually acceptable prices and other subcontract terms and conditions cannot be negotiated by the parties within a reasonable time, not to exceed 30 days unless extended by mutual consent, either party shall have the right, upon ten (10) days prior notice to the other, to terminate this Agreement; in which case the rights and obligations of both parties under this Agreement will terminate, except as expressly provided in Articles IV, VII and X hereof.

## ARTICLE III. TERMINATION

Except as expressly provided in Articles I, and II hereof, all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following:

a. Notice from the Customer that the bid process has been canceled, or that the prime contract(s) will not be awarded to the Company;

b. Award to other contractors to the exclusion of the Company of contracts for all or substantially all of the Program Work contemplated by the proposal(s);

c. Notice from the Customer that Teaming Partner is unacceptable in the role and function set forth in the proposal; provided, however, if the Customer requests a change in the role and/or function of Teaming Partner or the Company, this Agreement shall not be deemed terminated unless Teaming Partner and the Company fail to agree to effect appropriate changes within the time period permitted by the Customer;

d. The Company elects not to bid as the prime contractor for any phase of the Program;

e. Execution by both parties of the subcontract(s) contemplated by this Agreement;

f. The failure of the parties to reach mutual agreement on the terms of the contemplated subcontract(s);

g. The failure of the parties to reach a mutual agreement on the provision of payment and performance bonds as required by the Prime Contract;

h. The expiration of one (1) year from the effective date hereof; provided, however, if the proposal has been submitted and is under consideration by the Customer upon the expiration of such one (1) year period, this Agreement shall continue in force until terminated pursuant to one of the foregoing conditions.

## ARTICLE IV. PROPRIETARY INFORMATION

4.1 During the term of this Agreement, Teaming Partner and the Company, to the extent of each party's contractual and lawful right to do so, shall exchange such proprietary technical and other information as is reasonably required for each to perform its obligations hereunder. Teaming Partner and the Company each agree to keep in confidence and prevent the disclosure to any person(s) outside their respective organizations, or any person(s) within their organizations not having a need to know, all information received from the other which is designated in writing or by appropriate stamp or legend to be of a proprietary nature and to use such information only in connection with their obligations under this Agreement; provided, however, that neither party shall be liable for disclosure or use such data if the same:

a. Is or becomes publicly available; or

b. Was known to the party receiving it without restriction at the time of receipt; or

c. Is disclosed inadvertently despite the exercise of the same degree of care as the recipient party takes to preserve and safeguard its own proprietary information; or

d. Is disclosed to the Customer or its authorized representative in the performance of the obligations of either party under this Agreement of the prime contractor resultant subcontract, provided that any such information disclosed to the

Customer in a proposal shall be marked with an appropriate restrictive legend limiting use thereof to evaluation of such proposal; or

e. Was independently developed by the receiving party; or

f. Is obtained from a third party which has an unrestricted right to disclose the information; or

g. Is disclosed after five (5) years from the effective date of this Agreement, which five- (5) year period shall survive any termination of this Agreement.

If any portion of a party's proprietary information falls within any one of the above exceptions, the remainder shall continue to be subject to the foregoing prohibitions and restrictions.

4.2 Neither party shall use the other party's proprietary information for any purpose other than as is required for the performance of this Agreement.

4.3 The receiving party does not assume responsibility for release of proprietary information by the U.S. Government to the general public pursuant to the Freedom of Information Act, or any similar regulations or laws.

4.4 Proprietary information furnished hereunder shall remain the property of the furnishing party and shall be returned to such party promptly upon request. Neither this Agreement nor the furnishing of any information hereunder by either party to the other shall be construed as granting a license under any invention, patent, trademark, or copyright for manufacture, use, or sale of products/data of the disclosing party.

4.5 If no proprietary information or data is identified or marked with a restrictive notice, the receiving party may assume that all information and data is furnished with unlimited rights.

4.6 During the term of this Agreement, and for one (1) year following termination of this Agreement, neither party shall hire, directly or indirectly, any employee of the other company without the prior written consent of both parties.

## ARTICLE V. RELATIONSHIP

5.1 Nothing in this Agreement shall be deemed to constitute, create, give effect to, or otherwise recognize a joint venture, partnership, or formal business entity of any kind,

and the rights and obligations of the parties shall be limited to those expressly set forth herein. Nothing herein shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both of the parties, except as may be provided for in any resultant subcontract agreed to between the parties. The cooperation of the parties is for the purpose of contemplating their respective capabilities so that the Customer may best achieve the Program objectives.

5.2 Teaming Partner and its employees are at all times during the performance of this Agreement acting as an Independent Contractor, and not as employees of the Company. Teaming Partner shall be responsible for providing any and all personnel taxes, worker's compensation premiums, life, health, and automobile insurance premiums, and understands and agrees that no personal benefits, including but not limited to, vacation, sick leave, unemployment benefits, or retirement pay shall accrue to Teaming Partner or its employees.

## ARTICLE VI. PUBLICITY AND NEWS RELEASE

No releases shall be made to the news media or the general public relating to participation on the Program without the prior written approval of either the Company or Teaming Partner, which approval shall not be unreasonably withheld. The parties further agree that news releases made by either of them shall recognize the participation and contributions of the other party.

## ARTICLE VII. INDEMNITY

The employees of Teaming Partner and the Company shall obey all pertinent rules and regulations of the other party while on the premises of the other party, including these relating to the safeguarding of classified information. Each party agrees to indemnify and hold harmless the other party from and against claims for:

a. Damage to, or loss of use of, the other party's property;

b. Injury or death of any of the other party's employees or agents, to the extent of any such damage, injury or death is caused by any act or omission to act, including negligence, of the indemnifying party's employees or agents in connection with performance under this Agreement.

## ARTICLE VIII. ASSIGNMENT

Neither this Agreement nor any interest herein may be assigned, in whole or in part, by either party without the prior written consent of the other party, except that, without securing such prior consent, either party shall have the right to assign this Agreement to any successor of such party by way of merger or consolidation or the acquisition of substantially all of the entire assets of such party relating to the subject matter of this Agreement; provided, however, that such successor shall expressly assume all of the obligations of such party under this Agreement.

## ARTICLE IX. NOTICES

Any notice, consent, demand, or request required or permitted by this Agreement shall be in writing, and shall be deemed to have been sufficiently given when personally delivered or deposited in the United States mail, postage prepaid, addressed as follows:

**If to Company: KOMAN Construction**
2700 Gambell St. Suite 401
Anchorage, AK 99503
ATTN: Matthew Yates
Telephone: (520)678-1264

**If to Teaming Partner: Donley Construction**

716 South Philadelphia, Blvd

Aberdeen, MD 21001

ATTN: Jay Willems

Telephone: (443)307-6786

## ARTICLE X. LIMITATION OF LIABILITY

Except in cases of fraud, gross negligence or willful misconduct, and except for violations of Section IV of this Agreement, neither party shall be liable to the other for any indirect, incidental, special or consequential damages, however caused, whether as a consequence of the negligence of the one party or otherwise. In case of any exceptions, such damages must be proven by a preponderance of the evidence.

## ARTICLE XI. CONDITIONS ON OBLIGATIONS

The obligations of either party hereunder, including without limitation the obligations to prepare and submit any proposal and to award or accept any subcontract, are subject to the following conditions:

a. There shall be no limitation or proceeding pending or threatened against either party or any of its officers or employees (i) which is for the purpose of enjoining or otherwise restricting the activities contemplated by this Agreement, or otherwise claiming that any such activity is improper; or (ii) which would adversely affect the rights and/or capabilities of either party in respect of such activities.

b. Prior to the submission of any proposal or the award of any subcontract, there shall have been no material adverse change in the financial condition or operational capabilities of either party relating to the activities contemplated by this Agreement, and there shall not have been any occurrence, circumstance or combination thereof which might reasonably be expected to result in any material adverse change in the ability of either party to perform the work covered by such proposal or contemplated subcontract.

## ARTICLE XII. SCOPE OF AGREEMENT

This Agreement shall relate only to the Program(s) or contract(s) specified herein, and nothing herein shall be deemed to:

a. Confer any right or impose any obligation or restriction on either party with respect to any other program effort or marketing activity at any time undertaken by either party hereto, jointly or separately; or

b. Preclude either party hereto from soliciting or accepting any prime contract or subcontract from any third party prime contractor (or subcontractor of any tier) under any other program or under this Program after termination of this Agreement; or

c. Limit the rights of either party to promote market, sell, lease, license, or otherwise dispose of its standard products or services, except where such would conflict with the obligations of the party under this Agreement.

## ARTICLE XIII. ENTIRE AGREEMENT

This Agreement constitutes the entire understanding and agreement of and between the parties with respect to the subject matter hereof, and supersedes all prior representations and agreements, verbal or written. It shall not be varied, except by an instrument in writing of subsequent date, duly executed by an authorized representative of each party. Paragraph headings herein are for convenience only and shall not limit in any way the scope or interpretation of any provisions of this Agreement. The validity, construction, scope and performance of this Agreement shall be governed by the laws of the State of Alaska.

## ARTICLE XIV. ADDENDUM FOR JBAB CONTRACT

This Agreement is bound to the contract anticipated at Joint Base Bolling Anacostia in Washington DC for Indefinite Delivery/Indefinite Quantity task order work.  It is anticipated that a single year or multi-year contract may be developed from subsequent negotiations

with JBAB.  This contract may be for a maximum value of $4M per year or it may extend to multiple years and dollars over the cap of $4M as a sole source contract.  In either form, the intent for the contract will be that KOMAN carries the management employees based on the following proposed schedule:

Chris Robertson is $50.20/hr X 20hrs + payroll taxes & worker comp ($140) = $1,144/wk x 52 = $59,488 / year.  No benefits.

Bill Caviness is $34.85/hr x 40 hrs + payroll taxes & worker comp ($178) = $1,572/wk x 52 = $81,744 / year … plus monthly insurance/cell & bonus ($13,200) =  $95,000

This schedule will include the first year of the contract and any additional years unless cost of living raises are implemented by KOMAN.

These costs will be paid by KOMAN.  KOMAN will be compensated at the rate of 9.5% of the contract value for each task order.  Invoicing for this compensation will be based on submission of invoices and payment of said invoices from the Government.  All other costs will be subcontracted.  KOMAN's overhead, profit, indirect, and direct costs associated with the performance of this contract will be covered by the 9.5% rate. Required tasks may include program management, project management, supervision, administrative, certified payroll review and submission, Government invoicing, administrative correspondence, etc. In the event that the contract does not reach the $4M level in a contract year, both parties retain the ability to negotiate the final rate for that year that does not reach the presumed $4M per contract year level.  Bonding costs will be split 51/49 and paid by KOMAN with Donley Construction paying their 49% share to KOMAN.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**Donley Construction**                    **KOMAN Construction**

By: _____      By: _____

Jay Willems / Program Manager           Matthew Yates / General Manager