IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* ANGELA GOMEZ and<br>CHRISTOPHER HICKS,<br><br>    Plaintiffs,<br><br>v.<br><br>KOMAN CONSTRUCTION, LLC,<br>KOMAN ADVANTAGE, LLC,<br>KOMAN HOLDINGS, LLC,<br>NATIVES OF KODIAK, INC.,<br>STORMWATER PLANS, LLC DBA SWP<br>CONTRACTING & PAVING,<br>L&J CONTRACTORS, INC.,<br>BFL CONSTRUCTION CO., INC.,<br>HARRISON, WALKER AND HARPER, LP,<br>BOXX MODULAR, INC., and<br>DONLEY CONSTRUCTION, LLC,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § | CIVIL NO: 3:20-cv-00252<br><br><br><br><br><br><br><br><u>JURY TRIAL DEMANDED</u> |

<u>**RELATORS ANGELA GOMEZ AND CHRISTOPHER HICKS'**</u>
<u>**FIRST AMENDED COMPLAINT**</u>

## TABLE OF CONTENTS

I.    Introduction to Case ....................................................................................................1

II.   Jurisdiction and Venue ...............................................................................................4

III.  Introduction to Relators.............................................................................................4

    A.    Background on Relator Angela Gomez ..............................................................4

    B.    Background on Relator Christopher Hicks ..........................................................5

    C.    Original Source and Disclosures .........................................................................6

IV.   Introduction to Defendants.........................................................................................6

    A.    Koman Construction, LLC..................................................................................6

    B.    Koman Advantage, LLC .....................................................................................7

    C.    Koman Holdings, LLC........................................................................................8

    D.    Natives of Kodiak, Inc .......................................................................................9

    E.    Stormwater Plans LLC DBA SWP Contracting & Paving .................................9

    F.    L&J Contractors, Inc........................................................................................10

    G.    Boxx Modular, Inc. ..........................................................................................11

    H.    Donley Construction, LLC................................................................................11

V.    Respondeat Superior and Vicarious Liability .......................................................12

VI.   Federal Acquisition Regulation ("FAR")...............................................................13

    A.    Overview ...........................................................................................................13

    B.    Contracting by Negotiation ..............................................................................13

    C.    Contractor Responsibilities ..............................................................................14

    D.    Submission of Claims to the Government..........................................................14

    E.    Contractor Certifications...................................................................................15

    F.    Prohibition of Bid Rigging and Other Collusive Antitrust Violations...................15

G.     Consequences of Noncompliance ........................................................................16

VII.     Anti-Kickback Act ......................................................................................................17

A.     Overview ............................................................................................................17

B.     Definition of Kickback......................................................................................17

C.     Prohibition of Kickbacks...................................................................................17

VIII.     Defendants' Collusive and Fraudulent Schemes.........................................................18

A.     Defendants Engaged in an Ongoing Scheme by Which Defendants Fraudulently
Obtained and Maintained Government Contracts...............................................18

1.     The NOK Defendants Serve as Illegal Passthroughs.............................19

a.     Koman Advantage ........................................................................19

b.     Donley Construction .....................................................................21

c.     Boxx Modular ...............................................................................26

2.     Defendants Exchanged Illegal Kickbacks for Awarding Government
Contracts.................................................................................................28

3.     Defendants Engaged in Complementary Bidding, Bid Rigging, and Other
Collusive Activities.................................................................................32

a.     Defendants Wrongfully Overcharged the Government by
Inflating Costs...............................................................................32

b.     Defendants Engaged in Bid Rigging and Complementary
Bidding..........................................................................................37

c.     Koman Construction's General Manager Awarded Subcontracts to a
Company Owned by His Wife........................................................39

IX.     The NOK Defendants' Retaliation Against Relators .........................................................46

A.     The NOK Defendants unlawfully retaliated against Relator Christopher Hicks ...46

B.     The NOK Defendants unlawfully retaliated against Relator Angela Gomez ........52

X.     Actionable Conduct by Defendants.................................................................................56

A.     False Claims Act .................................................................................................56

1.     Applicable Law .........................................................................................56

2.    Defendants' Violations of the False Claims Act ........................................57

    **a.**    Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) ..................................................................57

    **b.**    Making or Using False Records or Statements Materials to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) ...............59

    **c.**    Conspiracy (31 U.S.C. § 3729(a)(1)(C)) ........................................60

    **d.**    Defendants' Retaliation Against Relators .....................................61

XI.    Causes of Action .................................................................................................62

    A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) ..................................................................62

    B.    Count II – Making or Using False Records or Statements Materials to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) ...................................................65

    C.    Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C)) .............................................66

    D.    Count IV – Retaliation (31 U.S.C. § 3730(h)) .........................................................68

XII.    Demand for Jury Trial .........................................................................................68

XIII.    Documentary Evidence .......................................................................................69

On behalf of the United States of America, and on their own behalf, Plaintiff- Relators Angela Gomez ("Gomez") and Christopher Hicks ("Hicks") (collectively, "Relators") bring this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732. Relators seek to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and on their own behalf and would respectfully show the following:

**I.**
**INTRODUCTION TO THE CASE**

1. This is an action to recover damages and civil penalties on behalf of the United States resulting from false and fraudulent statements and claims knowingly made by the Defendants to the government in violation of the FCA.

2. Defendants engaged in ongoing schemes by which Defendants fraudulently obtained and maintained government contracts. Relators have detailed knowledge of multiple schemes employed by Defendants, including bid rigging, complementary bidding, acting as illegal pass-throughs, awarding subcontracts without competition, giving and receiving kickbacks, and other fraudulent activities which resulted in the government awarding millions in set aside contracts.

3. First, Defendants conspired to utilize the NOK Defendants' 8(a) small business classification to obtain government contracts the Non-8(a) Defendants wouldn't otherwise be entitled to. Defendants achieved this end by using the NOK Defendants as illegal passthroughs for the Non-8(a) Defendants.

4. To do so, the NOK Defendants contracted with the government to provide base operations support services, construction services, and general contracting as 8(a) contractors. As a prime contractor, the NOK Defendants were required to perform at least 15% of the work with their own employees, excluding the cost of materials. The NOK Defendants secured government

1

contracts reserved for disadvantaged small businesses then knowingly passed all the work to non-8(a) participants like Defendants Donley and Boxx. The NOK Defendants failed to supervise or meaningfully participate for several projects. They illegally passed all the work to the Non-8(a) Defendants who complete the project from start to finish.

5.     The Non-8(a) Defendants did not expect the NOK Defendants to perform the work or provide any project management.  The NOK Defendants simply wielded their 8(a) status to secure contract awards, then abandoned their obligations to the highest bidder. By doing so, all Defendants fraudulently secured millions of dollars in 8(a) set aside contracts.

6.     Second, Defendants exchanged illegal kickbacks for government contracts. The NOK Defendants exerted improper influence over the contracting process by treating subcontractors to expensive outings in exchange for additional contracting opportunities. For example, the NOK Defendants arranged all-expense paid fishing and ski trips for their subcontractors. These illegal kickbacks were designed to ensure the subcontractors would continue to bring 8(a) sole source opportunities to the NOK Defendants. The Non-8(a) Defendants knowingly solicited and received illegal kickbacks in connection to government contracts as well. The Non-8(a) Defendants systematically steered sole-source contract opportunities to the NOK Defendants in exchange for the subcontract awards.

7.     Third, Defendants engaged in bid rigging, complementary bidding, and other collusive activities that undermine the integrity of the contracting process. Defendants routinely defrauded the Government by inflating cost estimates to artificially overstate the contract value. This resulted in Defendants fraudulently obtaining and maintaining public contracts at inflated prices and making claims for payment in violation of the FCA.

8.   A General Manager for the NOK Defendants went so far as to forge a "no-bid" letter the NOK Defendants later submitted to a contracting officer on the subcontractor's behalf. The same General Manager who forged the no-bid letter directed his wife to start a construction company and then steered multiple subcontracts to L&J.

9.   Further, the NOK Defendants have an arrangement where they subcontract to each other, even if neither entity intends to perform work on the contract. Either way, the NOK Defendants essentially double their profits.

10.   Defendants conspired amongst themselves to deceive the government. Defendants agreed to enter into this scheme to present false claims and statements to the United States and these false claims and statements were made in the furtherance of conspiracies to defraud the United States.

11.   Defendants made and/or caused to be made materially false statements and certifications to the government. These false certifications, reports, and claims falsely and/or fraudulently induced the government to award and make payments on set-aside contracts. Because the United States was falsely and/or fraudulently induced to complete these transactions with Defendants, each claim for payment under the contracts was a false claim actionable under the FCA.

12.   As a result of these false certifications, Defendants have worked together to defraud the Government out of millions.

## II.
## JURISDICTION AND VENUE

13.     Jurisdiction and venue are proper in the Western District of Texas pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relators' claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Western District of Texas. Defendants engage in business in the Western District of Texas and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## III.
## INTRODUCTION TO RELATORS

**A.     Background on Relator Angela Gomez**

14.     Relator Angela Gomez began working for Koman Construction in October 2017. She played multiple roles there, including business manager, business development, and construction project administrator. As the business manager, she was a liaison with the SBA and worked on compliance issues, such as Koman Construction's standard operating procedures. She was also involved in the contracting process, including bidding, proposals, budgets, and document management. In terms of business development, Ms. Gomez conducted site visits/bid walks, managed projects, prepared bids and proposals, and had various other responsibilities.

15.     Ms. Gomez's duties as a construction project administrator included procuring equipment and materials, acting as a liaison with customers and contracting officers, producing reports, reviewing invoices and project costs, document management, and other related responsibilities.

16.    Ms. Gomez was constructively discharged in July 2020 after experiencing sex discrimination, harassment, a hostile work environment, and other retaliation due to voicing complaints about Koman Construction's fraud.

**B.    Background on Relator Christopher Hicks**

17.    Relator Christopher Hicks has over twenty years of experience in the construction industry and has worked on numerous projects involving federal contracts. From 2005 to 2013, Mr. Hicks owned a construction company, Third Day Construction, and performed a number of contracts for NASJRB Fort Worth, TX, NASJRB Belle Chasse, and many other federal facilities. Mr. Hicks also assisted with demolition in St. Bernard Parish, Louisiana after Hurricane Katrina and coordinated EPA, LDEQ, DOT, OSHA and multiple other federal agencies to help write amended protocols for demolition and ACM demolition. Mr. Hicks started working as a project manager for Kirlin Builders in March 2013 and managed multiple USACE construction projects in Fort Campbell, Kentucky.

18.    In September 2016, Mr. Hicks became a project manager for Koman Construction. He supervised multiple NAVFAC projects in New Orleans, including demolition of twelve structures on base and repairing a hangar on an operational Navy flight line. Koman Construction promoted Mr. Hicks to Senior Project Manager in February 2019, where his primary focus has been on managing financials and projections on projects, business development, and training personnel. He has acted as proposal captain on multiple projects throughout the US and wrote the technical portion of proposals on numerous offerings. He also managed $20.5 million in five projects throughout the US.

19.    Mr. Hicks is a former employee of Koman Construction. Mr. Hicks was constructively discharged in August 2020 when Koman Construction demoted him to project

5

manager in retaliation for refusing to participate in Defendants' fraud and speaking out against it. Mr. Hicks' superiors took most of his projects away when they demoted him, and they also harassed him repeatedly and subjected him to a hostile environment.

## C.    Original Source and Disclosures

20.    There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relators are original sources as defined therein. Relators have direct and independent knowledge of the information on which their allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing a complaint by submitting pre-filing disclosure statements on July 14, 2020 and September 21, 2020.

21.    As required pursuant to 31 U.S.C. § 3730(b), Relators submitted an original disclosure statement to the Attorney General of the United States and the United States Attorney for the Western District of Texas contemporaneously with the service of their Original Complaint.

## IV.
## INTRODUCTION TO DEFENDANTS

## A.    Koman Construction, LLC

22.    Defendant KOMAN Construction, LLC (hereinafter, "Koman Construction") is an Alaskan limited liability company created in 2015. Koman Construction is headquarted in Chandler, Arizona and maintains a corporate office at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503. Koman Construction's registered agent for service of process is Corporation Service Company located at 15 West South Temple, Suite 600, Salt Lake City, Utah 84101. Koman Construction has answered and appeared herein and may be served through its counsel of record.

23.     Koman Construction is a member managed limited liability company and its sole member, Defendant Koman Holdings, LLC, is a wholly owned subsidiary of Defendant Natives of Kodiak, Inc.

24.     Koman Construction is a small, disadvantaged business[1] that contracts with the Department of Defense and other federal agencies to provide base operations support services, as well as construction management services, and general contracting.

25.     A contract with Koman Construction nets the Government the procurement benefit of best- value products, as well as the contracting efficiencies and financial benefits of employing an Alaska Native Corporation SBA 8(a) participant.

26.     Robert "Matthew' Yates was the General Manager of Koman Construction for most of the relevant timeframe. Mr. Yates is the husband of Jean M. Yates, owner of subcontractor L&J Construction. As General Manager, Matthew Yates had the final approving authority for many subcontracts relevant to this case. When Matthew Yates later became the General Manager of Defendant Koman Advantage, Robert Kyrklund became the General Manager at Koman Construction. Mr. Yates brought Mr. Kyrklund to Koman Construction prior to transitioning to Koman Advantage.

**B.     Koman Advantage, LLC**

27.     Defendant KOMAN Advantage, LLC (hereinafter, "KA") is an Alaskan limited liability company created on January 24, 2019. KA's corporate office in Alaska is located at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503. KA is headquartered at 3129 W. Hwy 83, Unit 8, Sonoita, Arizona 85637, with its registered agent, Corporation Service Company, located

---

[1] A Small Disadvantaged Business (SDB) is a small business that is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged.

7

at 9360 Glacier Hwy, Suite 202, Juneau, Alaska 99801. KA has answered and appeared herein and may be served through its counsel of record.

28.     KA is a member managed limited liability company and its sole member, Defendant Koman Holdings, LLC, is a wholly owned subsidiary of Defendant, Natives of Kodiak, Inc., benefiting as an Alaskan Native Corporation SBA 8(a) participant.

29.     KA specializes in programmatic, operational, logistics, engineering, and electrical support services for government and private sector clients. KA advertises that it employs multiple subcontractors and that its services include lighting, utilities, electrical protection, maintenance services, installation support, panel upgrades, and program support.

30.     Shortly after forming KA, Koman Construction began subcontracting work to KA. Now, however, KA bids on contracts as the prime contractor and subcontracts work to Koman Construction.

## C.     Koman Holdings, LLC

31.     Defendant KOMAN Holdings, LLC (hereinafter, "Koman Holdings") is an Alaskan limited liability company formed in 2008 and headquartered in Anchorage, Alaska. Koman Holdings' corporate office is located at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503 and its registered agent for service of process is Corporation Service Company, 9360 Glacier Highway, Suite 202, Juneau, Alaska 99801. Koman Holdings has answered and appeared herein and may be served through its counsel of record.

32.     Koman Holdings is a wholly owned subsidiary of Natives of Kodiak ("NOK"). Koman Holdings is the parent company of Defendants Koman Construction, Inc., Koman Advantage, and SWP Contracting and Paving. Koman Holdings is a holding company established to own and oversee most of the operating entities of the NOK family of companies.

8

33.     Koman Holdings, through its subsidiaries, provides environmental consulting services, construction, remediation, civil contracting, civil engineering, and timber and forest management. Koman Holdings also provides goods and services to various federal agencies, the State of Alaska, and commercial clients.

**D.     Natives of Kodiak, Inc.**

34.     Defendant Natives of Kodiak, Inc. (hereinafter, "NOK") was incorporated in Alaska in 1973 and is headquartered in Kodiak, Alaska. NOK's corporate office is located at 215 Mission Road, Suite 212, Kodiak, Alaska 99615, and its registered agent is Corporation Service Company, 9360 Glacier Highway, Suite 202, Juneau, Alaska 99801. NOK has answered and appeared herein and may be served through its counsel of record.

35.     NOK is an Alaska Native Corporation incorporated under Alaska law and pursuant to the 1971 federal Alaska Native Claims Settlement Act ("ANCSA")[2]. NOK is managed by its President and CEO, Jim Erickson, and is governed by a nine-member Board of Directors comprised of elected shareholders. NOK is the parent corporation of Koman Holdings, LLC.

**E.     Stormwater Plans, LLC DBA SWP Contracting & Paving**

36.     Defendant Stormwater Plans, LLC DBA SWP Contracting & Paving (hereinafter, "SWP") is an Arizona limited liability company formed on March 4, 2019. SWP's corporate office is located at 5624 N. 54th Ave., Glendale, Arizona 85301. SWP's registered agent is Corporation

---

[2] An Alaska Native Corporation is any Regional, Village, Urban, or Group Corporation organized under the laws of the State of Alaska in accordance with the ANCSA. Natives of Kodiak is one of the original corporations created by the ANCSA, whereby the Alaska natives surrendered their ancestral land claims for "certain valuable considerations" that included federal government contracting preferences. The Act established a system of village and regional Native corporations to manage the lands and cash payments and made extensive provisions regarding the operations of the corporations.

Service Company, 8825 N. 23rd Ave, Ste. 100, Phoenix, Arizona 85021-4148. SWP has answered and appeared herein and may be served through its counsel of record.

37.     SWP is a wholly owned subsidiary of NOK, benefiting as an Alaskan Native Corporation SBA 8(a) participant. SWP specializes in construction and its services include underground construction, excavating, design/build construction, pavement preservation, demolition, concrete, utilities, and airfield construction and lighting. Koman Construction has subcontracted with SWP on multiple projects.

**F.      L&J Contractors, Inc.**

38.     Defendant L&J Contractors, Inc. (hereinafter, "L&J") is a for-profit corporation organized under the laws of the State of Arizona on September 19, 2018. L&J is a construction company specializing in various aspects of general contracting. L&J lists its corporate address as 38 Page Lane, Elgin, Arizona 85611, which is the residential address of Robert Matthew Yates and his wife, Jean M. Yates. Defendant L&J has appeared herein and may be served through its counsel of record.

39.     L&J, at the time of incorporation, listed Jean Yates as the President of the company. Jean Yates was also listed as the Director and President of the company on an October 9, 2019 annual report filed with the Arizona Secretary of State.[3]

40.     According to records from the Mississippi Secretary of State, L&J opened a branch in Gautier, Mississippi on January 3, 2019. The records list the Mississippi branch as located at 1824 Piney Lane, Gautier, Mississippi 39553.[4] Property records reveal this location is a single-

---

[3] *See* **Exhibit 1** - L&J October 9, 2019 Annual Report
[4] From September 25, 2019 through December 29, 2019, the status of the Mississippi branch was "Inactive." On December 29, 2019, the Mississippi branch reported a change in corporate status from "Good Standing" to "Withdrawn."

family residence, and it is believed to be owned by Rita Garris, who is Jean Yates' sister and Robert Yates' sister-in-law. The Secretary of State records list Lucas Robinson as President, Jean Yates as Treasurer, and Rita Garris as Secretary. Matthew Yates also hired Ms. Garris to work at Koman Construction after he began subcontracting to L&J.

**G.    Boxx Modular, Inc.**

41.    Defendant Boxx Modular, Inc. (hereinafter, "Boxx") is a for profit corporation originally organized under the laws of the state of Delaware as Nortex Modular Leasing and Construction Company.   By its Amendment to Registration dated July 19, 2010, Nortex Modular Leasing and Construction Company changed its name to Boxx Modular, Inc.

42.    Boxx's corporate office is located at 3475 High River Rd., Fort Worth, Texas 76155 and Boxx's registered agent is CT Corporation Systems/National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, Texas 75201.Boxx has appeared herein and may be served through its counsel of record.

43.    Boxx is a subsidiary of the Black Diamond Group Ltd., a company that provides services in Canada, the United States, and Australia. Boxx rents, leases, and sells temporary and permanent modular buildings, including mobile offices, classrooms, lavatories, medical centers, bank facilities, and storage containers. Boxx is a subcontractor to the NOK Defendants.

**H.    Donley Construction, LLC**

44.    Defendant Donley Construction, LLC (hereinafter, "Donley") is a Maryland limited liability company founded in 1999 that maintains a principal address at 716 South Philadelphia Blvd., Aberdeen, MD 21001. Donley's registered agent is Ilani A. Donley, 2304 Snow Rd., Edgewood, Maryland 21040. Donley has made an appearance herein and may be served through its counsel of record.

45. Donley is a Native American owned business that has been working on federal contracts for over twenty years. Donley was certified as an 8(a) small business from 2002 through 2011. Donley has many ongoing or completed IDIQ, MATOC, JOC and SABER contracts with all branches of the Department of Defense. These contracts are for construction, renovation, repair, and improvements to real property at existing federal facilities. The NOK Defendants have awarded multiple subcontracts to Donley.

46. Unless otherwise specified, Koman Construction, LLC, Koman Advantage, LLC, Koman Holdings, LLC, Natives of Kodiak, Inc., SWP Contracting & Paving, L&J Contractors, Inc., Boxx Modular, Inc., and Donley Construction, LLC will be collectively referred to herein as "Defendants." L&J Contractors, Boxx Modular, Inc. and Donley Construction, LLC are collectively referred to as the "Non-8(a) Defendants".

## V.
## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

47. Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

48. Defendants Koman Construction, KA, SWP, Koman Holdings, and NOK (collectively hereinafter, the "NOK Defendants") are related entities sharing common employees, offices, and business names such that they are jointly and severally liable. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

12

49.     Koman Construction, KA, and SWP are wholly owned subsidiaries of Koman Holdings and NOK. The NOK board oversees and manages Koman Construction, KA, Koman Holdings, and SWP. Koman Construction and KA share an address at 2700 Gambell Street, Suite 401, Anchorage, Alaska 99503, which is where parent companies Koman Holdings and NOK are also headquartered.

**VI.**
**FEDERAL ACQUISITION REGULATION ("FAR")**

**A.     Overview**

50.     The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for federal contracts.  The FAR is codified in Title 48 of the United States Code of Federal Regulations.

51.     The Defense Federal Acquisition Regulation Supplement ("DFARS") is a system of regulations administered by the Department of Defense for the purpose of implementing and supplementing the FAR. DFARS establishes delegations of FAR authorities, deviations from FAR requirements, DoD-wide policies, and should be read in conjunction with the primary set of rules in FAR.

**B.     Contracting by Negotiation**

52.     Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract. 48 C.F.R. § 15.000. The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value.  48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation,

13

provides the greatest overall benefit in response to the requirement.  48 C.F.R. § 2.101(b)(2).

53.    An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance.  48 C.F.R. § 15.304(b).

**C.    Contractor Responsibilities**

54.    Pursuant to 48 C.F.R. § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and, (2) Tendering to the Government for acceptance only those supplies or services that conform to contract requirements." Contractors are responsible for implementing "procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. § 46.105(c).

**D.    Submission of Claims to the Government**

55.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance.  With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. 48 C.F.R. § 32.905(c). Documentation must include, at a minimum, description of the supplies delivered, or services performed, and quantities of supplies received and accepted, or services performed.  48 C.F.R. § 32.905(c)(2) and (3).

56.    Pursuant to 48 C.F.R. § 32.007(a)(1), contract financing payments are due the thirtieth day after the designated billing office receives "a proper contract financing request." A proper contract financing request "must comply with the terms and conditions specified by the

contract," and the contractor must correct any defects in requests submitted. 48 C.F.R. § 32.007(c).

**E.    Contractor Certifications**

57.    The general FAR invoice requires the contractor to certify that the voucher is proper. Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment." 48 C.F.R. § 53.301-1034. By certifying that the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

58.    Contractors are also required to make the following certifications when submitting any claim exceeding $100,000: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor." *See* 48 C.F.R. § 33.207(c).

**F.    Prohibition of Bid Rigging and Other Collusive Antitrust Violations**

59.    Regarding bidding, the offeror must certify that the prices in the offer have been "arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices." 48 C.F.R. § 52.203-2(a)(1)(i). The prices in the offer must not have been "knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law." C.F.R. § 52.203-2(a)(2). No attempt can be made by the offeror to induce any other offeror or competitor "to submit or not to submit an offer for the purpose of restricting competition." 48 C.F.R. § 52.203-2(a)(3).

60.     Per 48 C.F.R. § 3.303(b), "the antitrust laws are intended to ensure that markets operate competitively." Therefore, agreements made among competing entities that restrain "the natural operation of market forces [are] suspect." Activities that evidence an antitrust violation may include: "an industry price to which contractors refer in formulating their offers, a sudden change from competitive bidding to identical bidding, simultaneous price increases or follow-the-leader pricing, rotation of bids or proposals, division of the market, establishment by competitors of a collusive price estimating system, the filing of a joint bid by two or more competitors, any incidents suggesting direct collusion among competitors, and assertions by the employees, former employees, or competitors of offerors, that an agreement to restrain trade exists." 48 C.F.R. § 3.303(c)(1)-(9). Agencies are required to report to the Attorney General any bids or proposals that are suspected to be in violation of antitrust laws. 48 C.F.R. § 3.303 (a).

## G.     Consequences of Noncompliance

61.     A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract, constitutes grounds for debarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). Moreover, the Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

# VII.
# ANTI-KICKBACK ACT

**A.    Overview**

62.    "The Anti-Kickback Act of 1986 was passed to deter subcontractors from making payments and contractors from accepting payments for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or a subcontract relating to a prime contract." 48 C.F.R. § 3.502-2. The Anti-Kickback Act is codified in Title 41, chapter 87, of the United States Code.

**B.    Definition of Kickback**

63.    Pursuant to both 48 C.F.R. § 3.502-1 and 41 U.S.C. § 8701(2), "kickback means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

**C.    Prohibition of Kickbacks**

64.    "The Kickbacks statute prohibits any person from providing, attempting to provide, or offering to provide any kickback." 48 C.F.R. § 3.502-2(a)(1). Additionally, the statute prohibits "soliciting, accepting, or attempting to accept any kickbacks." 48 C.F.R. § 3.502-2(a)(2). The statute also prohibits "including, directly or indirectly, the amount of any kickback in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States." 48 C.F.R. § 3.502-2(a)(3). These prohibitions are also stated in Title 41, chapter 87, section 8702 of the United States Code.

17

65.     Criminal penalties will be imposed on any person who "knowingly and willfully engages" in prohibited conduct such as kickbacks. 48 C.F.R. § 3.502-2(b). The United States can recover civil penalties "from any person who knowingly engages in such prohibited conduct and from any person whose employee, subcontractor, or subcontractor employee provides, accepts, or charges a kickback." 48 C.F.R. § 3.502-2(c).

## VIII.
## DEFENDANTS' COLLUSIVE AND FRAUDULENT SCHEMES

66.     Relators have detailed knowledge of multiple schemes employed by Defendants, including bid rigging, complementary bidding, acting as a pass-through, awarding subcontracts without competition, giving and receiving kickbacks, and other fraudulent activities.

**A.      Defendants Engaged in an Ongoing Scheme by Which Defendants Fraudulently Obtained and Maintained Government Contracts.**

67.     As an Alaska Native Corporation, NOK and its subsidiaries contract with the government to provide base operations support services, construction services, and general contracting. Here, Defendants conspired to utilize the NOK Defendants' 8(a) small business classification to obtain government contracts Donley, Boxx, and L&J wouldn't otherwise be entitled to. Simply, the NOK Defendants and the Non-8(a) Defendants conspired to exploit the NOK Defendants' access to set aside contracting opportunities for financial gain.

68.     As a prime contractor, the NOK Defendants were required to perform at least 15% of the work with their own employees, excluding the cost of materials. The NOK Defendants secured government contracts reserved for disadvantaged small businesses then knowingly passed all the work to non-8(a) participants like Defendants Donley and Boxx.

69.     The NOK Defendants did not perform any of the work on these contracts and the Non-8(a) Defendants did not expect the NOK Defendants to perform the work.  The NOK Defendants simply wielded their 8(a) status to secure contract awards, then abandoned their

18

obligations to the highest bidder. By doing so, all Defendants fraudulently secured millions of dollars in SBA contracts.

### 1. THE NOK DEFENDANTS SERVE AS ILLEGAL PASSTHROUGHS

70.    Here, Defendants conspired to use the NOK Defendants' 8(a) status to fraudulently gain access to millions of dollars in set aside contracts which the NOK Defendants illegally passed through to the Non-8(a) Defendants. The NOK Defendants conspired with companies that would both (1) perform all the work passed through under the government contracts awarded to the NOK Defendants; and (2) manufacture more opportunities for the NOK Defendants to secure government contracts.

### a. Koman Advantage

71.    The government routinely awarded Koman Construction set-aside contracts as an 8(a) participant and wholly owned subsidiary of NOK. Koman Construction would then subcontract to KA as its primary subcontractor. KA would then subcontract out the work to a third tier. Koman Construction developed KA as a standalone company that operates as an "in-house" electrical division. Koman Construction and KA had an arrangement whereby all electrical work Koman Construction received was subcontracted to KA. Now, Koman Construction and KA have a new arrangement in which KA is the prime contractor and subcontracts work to Koman Construction, thereby establishing a fraudulent scheme in which KA and Koman Construction charge the government twice for the same work.

### (i)    *Fort Huachuca - Contract No. W19RUS20P0069*

72.    For example, KA was awarded a contract to perform work at Fort Huachuca (contract no. W19RUS20P0069), and then subcontracted the work to Koman Construction for $1,310,458.00. As another example, the National Oceanic and Atmospheric Administration

19

(NOAA) in Miami awarded a contract to Koman Construction and has offered multiple others.

73.     NOAA sent Koman Construction a Request for Proposal ("RFP") on August 28, 2020. Matthew Yates decided to talk to the Contracting Officer to try to get the contract shifted to KA so that KA could then subcontract work to Koman Construction. KA and Koman Construction colluded to build in two layers of profit and overhead for no reason other than greed. Further, both KA and Koman Construction passed through almost all the work to non-8(a) subcontractors. By making claims for payment, Koman Construction and KA specifically represented that each completed some portion of the work under each respective contract despite knowing this assertion to be completely false.

(ii)     *Tyndall Air force Base - Contract No. W9127819C0044*

74.     Koman Construction was awarded a contract for work at Tyndall Air Force Base (contract no. W9127819C0044) on September 29, 2019 in the amount of $7,791,800.69. Koman Construction assigned Relator Hicks as the Project Manager but Realtor Hicks was explicitly instructed that he was not allowed to manage the contract. Koman Construction subcontracted the electrical portion of the project to KA.

75.     Despite KA's subcontract for the electrical component of the project, Matthew Yates instructed Relator, an employee of Koman Construction, to complete portions of KA's obligations under the subcontract. Relator told his supervisor that KA had the contractual obligation and should assume the risk for the electrical plans. Relator further explained his team was not qualified to perform the task requested. When he complained that he was unable to manage a project he was responsible for, Relator Hicks was removed from the project.

76.     By making claims for payment, Koman Construction and KA represented that each completed work pursuant to the contract. The contract provided for project management from

Koman Construction. Defendants' representations that Koman Construction would manage the prime contract and KA would perform the electrical work were false and in violation of the FCA.

### b. Donley Construction

77.    Defendant Donley, a large company, graduated from the 8(a) program in 2011 and is similarly complicit. Koman Construction served as nothing more than a front for subcontractor Donley on multiple contracts. Matthew Yates, the former General Manager of Koman Construction, previously worked for Kirlin, with Kirlin having a joint-venture project with Donley. Thus, Donley and Yates had an established relationship. Despite Donley's ineligibility, Donley approached Koman Construction with small business contracting opportunities. Koman Construction did not solicit or pursue these contracting opportunities until Donley presented them to Koman Construction.

78.    Donley introduced Koman Construction to decision makers and prepared the bid(s) Koman Construction would submit to the government. In exchange, Koman Construction guaranteed Donley the subcontract(s). When the government awarded Koman Construction the contract(s), Koman Construction would then pass through all the work it was responsible for performing as the prime contractor to Donley in contravention of FAR regulations and SBA requirements.

### (i)    *Bolling Air Force Base - W9127S-18C-6002*

79.    Koman Construction and Donley carried out the scheme on several occasions. During the bidding process for a contract to perform work on Bolling Air Force Base (contract no. W9127S-18C-6002), Donley knew the RFP would be available as Donley previously served as an incumbent contractor on the Bolling Air Force Base contract and had preexisting relationships with contracting officers. As the project became available, Donley contacted

21

Koman Construction and covertly facilitated Koman Construction's proposal for the direct award. Donley prepared Koman Construction's bid, reflecting a bid price of $1,016,198.35.[5]

80.     The government awarded the contract to Koman Construction on September 12, 2018, for $1,420,410.00. True to the scheme, Koman Construction then subcontracted $1,289,567.35 - more than 85% of the contract value – of the work to Donley. Koman Construction was entirely hands-off during the bid process. Likewise, Koman Construction was hands-off during the performance of the contract.

81.     Koman Construction falsely represented to the government that it would provide an onsite Program Manager and materially participate in the oversight of the prime contract. It failed to do so. Koman Construction had no personnel on site during the project, and Donley managed and completed all the work. Additionally, as part of the contracting process, Koman Construction certified that it would incur costs of $404,211.65 for oversight, management, overhead, profit, etc. This was a material misrepresentation in that the bid did not reflect the true cost to Koman Construction as it falsely inflated management and oversight costs Koman Construction had no intention of incurring

82.     Defendants' representations that Koman Construction would provide an onsite manager and materially participate in the oversight of the prime contract were false because neither Koman Construction, nor Donley, intended for Koman Construction to participate in any meaningful way.

83.     Donley submitted claims for payment and was ultimately paid on the contract. Koman Construction ultimately submitted claims for payment for oversight and management when it provided none. Defendants also falsely certified compliance with the terms

---

[5] *See* **Exhibit 35** - August 10, 2018 Donley Construction Proposal

of its 8(a) sole source contract when they made claims for payment.

84.     Both Donley and Koman Construction went into the Bolling Air Force Base contract with the express understanding Koman Construction would not provide oversight. By making claims for payment, Koman Construction specifically represented that it completed some portion of the work under the respective contract. Koman Construction and Donley's representations during the bid process and at the time of payment were patently false.

(ii)    *Joint Base Anacostia-Bolling - N4008019D1603*

85.     Koman Construction was also completely hands-off during the bidding process for a Navy contract to perform work at Joint Base Anacostia-Bolling in Washington DC (contract no. N4008019D1603), which was awarded to Koman Construction on May 1, 2019. Donley contacted Koman Construction and facilitated introductions between Koman Construction and the decision maker on site. Relator Hicks attended this meeting.

86.     The contract awarded $2 million per year for up to 5 years for a total of $10,000,000.00. Again, Donley completely handled the bidding process in exchange for the subcontract award. Koman Construction again failed to provide any project management or oversight once the contract was awarded.[6]

87.     Koman Construction instead entered into a written agreement to hire one or two Donley personnel to manage this contract and pay Donley's accountant as a "consultant" to handle the books.[7] Furthermore, the parties agreed to "settle up" and split the profits at the end of each contract year.[8] Relator Hicks was on the phone call with Robert Kyrklund, Jay Willems

---

[6] *See* **Exhibit 36** - May 1, 2019 email requesting bid proposal from Donley
[7] *See* **Exhibit 18** - February 18, 2019 "Teaming Agreement" between Koman Construction and Donley; *see also* **Exhibit 19** - July 2, 2019 e-mail chain regarding allocating compensation
[8] *See* **Exhibit 20** - July 10, 2019 e-mail from Robert Kyrklund

(Donley Program Manager), and Chris Robertson where Donley agreed to pay Koman Construction "10% across the board."[9]

88.    Donley submitted claims for payment and was ultimately paid on the contract.[10] Donley's January 30, 2019 application and certification for payment provided:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

89.    Koman Construction and Donley submitted and/or caused to be submitted claims for payment that falsely certified Koman Construction provided oversight and management that it did not provide.

### (iii)   *Joint Base Anacostia-Bolling - Contract No. N400802-C0011*

90.    Koman Construction was awarded an additional contract (contract no. N400802-C0011), valued at $890,089.95, to renovate locker rooms at Joint Base Anacostia-Bolling. Donley, not Koman Construction, performed the work on the contract—continuing Donley and Koman Construction's fraudulent pass-through scheme.

91.    Donley program manager, Jay Willems, directed Relators to send RFPs from the JBAB contracting officer to him directly.[11] Jay Willems also asked Relators for a computer and Koman Construction email so Donley could handle the contract and correspondence themselves.[12] Donley directly communicated with contracting officers on Koman

---

[9] *See* **Exhibit 19** - July 2, 2019 e-mail chain regarding allocating compensation
[10] *See* **Exhibit 37** - Donley JBAB Invoice
[11] *See* **Exhibit 38** - April 4, 2019 Email from Jay Willems to Relators
[12] *Id.*

Construction's behalf. Chris Robertson with Donley emailed Mr. Hicks, assuring him that he would "forward the proposal to you to submit once its finalized" for the JBAB repair lift stations project.[13]

92.     During the JBAB contract, Mr. Hicks witnessed first-hand how Koman Construction and Donley tried to conceal their fraudulent conduct. Donley placed Koman Construction magnets on Donley trucks. Koman Construction purchased uniforms that Donley employees wore at the jobsite to give the appearance Koman Construction was working on the contract.

93.     Mr. Hicks was asked to complete a questionnaire regarding the JBAB contract for Koman Construction's 2019 financial statement audit. Mr. Hicks communicated that he was unable to honestly complete the questionnaire because Koman Construction was not managing the project. On March 4, 2020, Donley employees completed the questionnaire for Koman Construction's financial statement audit.[14]

(iv)   *Naval Academy - Contract No. N4008020R3502*

94.     Koman Construction was recently awarded another five-year contract valued at $10 million to perform work at the Naval Academy in Annapolis, Maryland (contract no. N4008020R3502). Koman Construction subcontracted to Donley, passing through all of its obligations as the prime contractor. As with the other contracts, Donley was the company that actually performed the work.

95.     Donley and Koman Construction knowingly schemed to present false claims to the government, and their false claims and statements were made in furtherance of the conspiracy to

---

[13] *See* **Exhibit 39** - May 1, 2019 Email from Chris Robertson to Relator Hicks and Jay Willems
[14] *See* **Exhibit 22** – March 4, 2020 Email

defraud the government. The purpose of the scheme was to receive payments for claims made under false pretenses from fraudulently obtained contracts.

96.   By making claims for payment, Koman Construction and Donley specifically represented that Koman Construction completed some portion of the work under the respective contract. Accordingly, all claims concerning Koman Construction's anticipated costs, profits, and participation submitted or caused to be submitted by Koman Construction and/or Donley constitute false and fraudulent claims on the United States.

97.   Donley knowingly participated in the scheme. Donley prepared the bid Koman Construction submitted to the government. Donley included an inflated cost allocation for oversight both Donley and Koman Construction knew Koman Construction would not perform.

98.   Donley and Koman Construction made and/or caused to be made materially false statements and certifications to the government. These false certifications, reports, and claims falsely and/or fraudulently induced the government to award and make payments on set-aside contracts. Because the United States was falsely and/or fraudulently induced to complete these transactions with Donley and Koman Construction, each claim for payment under the contracts was a false claim actionable under the FCA.

99.   As a result of these false certifications, the government was falsely and/or fraudulently induced to award the Defendants millions in government contracts reserved for small business concerns.

### c.   **Boxx Modular**

100.   Boxx similarly colluded with the NOK Defendants in the pass-through scheme. Boxx conspired with the NOK Defendants to exploit the NOK Defendants' access to set aside contracting opportunities for financial gain.

101.    Relator Hicks met with a project manager from Boxx who told him Matthew Yates and Robert Kyrklund previously worked with Harold Weatherly. At the time of the fraud detailed in this Complaint, Harold Weatherly was working as a Major Projects Director for Boxx.

102.    Like Donley, Boxx is ineligible to obtain sole-source contracts as an 8(a) small business. Despite Boxx's ineligibility, Boxx approached Koman Construction with small business contracting opportunities.[15] In exchange, Koman Construction not only guaranteed Boxx the subcontract, but agreed to pass through all of its obligations as the prime contractor.

103.    When the government awarded Koman Construction a contract, Koman Construction would then pass through all the work it responsible for performing as the prime contractor to Boxx in contravention of FAR regulations and SBA requirements.

(i)    *Hill Air Force Base - Contract No. FA820120C0006*

104.    Koman Construction was awarded an 8(a) set aside contract to perform work at the Hill Air Force Base.[16] The contract was awarded on February 27, 2020 for $1,843,662.71. Koman Construction included a cost allocation for prime labor, G&A, and profit at $348,426.06.[17] This was a material misrepresentation in that the bid did not reflect the true cost to Koman Construction as it falsely included management and oversight costs Koman Construction had no intention of incurring.

105.    Boxx and Koman Construction's representations that Koman Construction would materially participate in the oversight of the prime contract were false because neither Koman Construction, nor Boxx, intended for Koman Construction to participate in any meaningful way.

106.    Boxx submitted claims for payment and was ultimately paid on the

---

[15] *See* **Exhibit 40** – April 14, 2020 email from Harold Weatherly to Angela Gomez
[16] *See* **Exhibit 41** – Executed Contract for Hill AFB Project FA820120C0006
[17] *Id*. at p. 3.

contract.  Koman Construction also submitted claims for payment for project management when it provided none. Boxx and Koman Construction also falsely certified compliance with the terms of the 8(a) sole source contract when they made claims for payment. By making claims for payment, Koman Construction specifically represented that it completed some portion of the work under the respective contract. Koman Construction and Boxx's representations during the bid process and at the time of payment were false.

107.   Boxx and Koman Construction made and/or caused to be made materially false statements and certifications to the government. These false certifications, reports, and claims falsely and/or fraudulently induced the government to award and make payments on set-aside contracts. Because the United States was falsely and/or fraudulently induced to complete these transactions with Boxx and Koman Construction, each claim for payment under the contracts was a false claim actionable under the FCA.

108.   As a result of these false certifications, the government was falsely and/or fraudulently induced to award the NOK Defendants and Boxx millions in government contracts reserved for small business concerns.

### 2.   DEFENDANTS EXCHANGED ILLEGAL KICKBACKS FOR AWARDING GOVERNMENT CONTRACTS

109.   As mentioned previously, Defendants routinely solicited and/or received illegal kickbacks in exchange for government contracts.

110.   An AKA violation is predicated on the grounds that: (1) Defendants expressly undertook to comply with the AKA as a condition of payment under the prime contracts and their flow down provisions, and certified (either expressly and/or impliedly) that they complied with the AKA as a condition of payment, thereby supporting liability for making false certifications; and/or (2) violations of the AKA taint the claims submitted to the government and renders the

claims "factually false" and ineligible for payment because they violate a condition of payment.

111.    The NOK Defendants routinely partnered with the Non-8(a) Defendants in the kickback scheme. Donley and Boxx systematically steered sole-source contract opportunities to Koman Construction in exchange for the subcontract award.

112.    The NOK Defendants also exerted improper influence over the contracting process by treating other contractors to expensive outings. The NOK Defendants provided these gratuities as an inducement to co-conspirators necessary for the continuation of multiple complementary bid schemes.

113.    For example, the NOK Defendants paid for the following fishing trips:

| Date | Location | NOK Defendant Attendees | Contractor | Contractor Attendees |
|---|---|---|---|---|
| Summer 2018 | Sitka, Alaska | Bruce Beck<br>Robert Yates | HWH | Randal Stanley<br>Tim Glenn<br>Charles Cayton |
| Fall 2018 | Munds Park, Arizona | Matthew Yates | L&J<br>BFL | Jean Yates<br>Ricky Robinson and wife |
| Jan 2019 | Honolulu, Hawaii | Matthew Yates | L&J<br>Zapata[18] | Jean Yates<br>Shane Smith<br>Brett Butler |
| Summer 2019 | Seward, Alaska | Matthew Yates<br>Robert Kyrklund<br>Zigmund Peacock<br>Grant Ellingson and wife | BFL<br>L&J<br>Ross & Barruzini[19] | Ricky Robinson<br>Lucas Robinson<br>Mike Shea |

---

[18] Zapata is an engineering firm that Koman Construction has worked for as a subcontractor.

[19] Ross & Barruzini (R&B) is an engineering firm that KOMAN does business with regularly. R&B, which has a corporate office in St. Louis, is considered to be Koman Construction's primary design firm, and works with Koman Construction on the Tyndall Air Force Base contract.

| Fall 2018 | Munds Park, Arizona | Matthew Yates | L&J BFL | Jean Yates Ricky Robinson and wife |
| Jan 2019 | Honolulu, Hawaii | Matthew Yates | L&J Zapata[20] | Jean Yates Shane Smith Brett Butler |

114.    Matthew Yates and Robert Kyrklund also attended events hosted by subcontractors. In addition to the fishing trips, Mr. Yates and Mr. Kyrklund purchased a suite for $170,000 in early 2020 at Gila River Arena to use for entertaining subcontractors, including Boxx.

115.    Koman Construction exchanged illegal kickbacks with Boxx to secure additional opportunities to secure government contracts. Boxx paid for Robert Kyrklund and Matthew Yates to attend a hockey game in February of 2020. Boxx attended a ski trip hosted by Matthew Yates and paid for by Koman Construction on February 26-28, 2020 in return.

116.    Following Robert Kyrklund and Matthew Yates' expense-paid trip courtesy of Boxx, Koman Construction issued the following subcontracts to Boxx: (1) Hill Air Force Base (Contract No. FA820120C0006) awarded on February 27, 2020 for $1,843,662.71; and (2) MacDill Air Force Base (Contract No. W9127820C0015) awarded on April 10, 2020.

117.    Koman Construction arranged an all-expense paid fishing trip for Boxx subcontractors. The illegal kickbacks to Boxx were designed to ensure Boxx would continue to bring 8(a) sole source opportunities to the NOK Defendants.

118.    The NOK Defendants sent the Non-8(a) Defendants Christmas gifts and paid bar their bar tabs.[21]

---

[20] Zapata is an engineering firm that Koman Construction has worked for as a subcontractor.

[21] **Exhibit 42** - Receipts for subcontractor kickbacks; *see also* **Exhibit 43** - Receipt for Christmas baskets by NOK Defendants to subcontractors

119.    Defendants had reasonable grounds to believe violations of the AKA were occurring and failed to promptly report the possible violations to the government. These failures constitute further violations of the AKA.

120.    Defendants violated the FCA by expressly or impliedly making false statements, records, or certifications in response to the governments RFP that they were complying and would continue to comply with the AKA.

121.    Defendants committed additional violations of the FCA by presenting or causing to be presented to the government their claims to obtain payment in which they expressly or impliedly made false statements, records, or certifications that they complied with the AKA.

122.    The United States government, either directly or indirectly through its agencies or intermediaries, would not have contracted with the Defendants due to conflict or other reasons and/or would have sought significant cost and/or price concessions had it known the contracts/subcontracts, products, and/or services for which the contracts were proposed were subject to a scheme to violate AKA provisions and applicable FARs.

123.    The United States government, either directly or indirectly through its agencies or intermediaries, would not have honored the Defendants' claims for payment, had it known the contracts/subcontracts, products, and/or services for which the contracts were proposed were subject to a scheme to violate AKA provisions and applicable FARs.

3.   DEFENDANTS ENGAGED IN COMPLEMENTARY BIDDING, BID RIGGING, AND OTHER COLLUSIVE ACTIVITIES.

124.   The NOK family of companies have a pattern and practice of conspiring with the Non-8(a) Defendants to circumvent the fair bid process. Here, Defendants engaged in bid rigging, complementary bidding, and other collusive activities that undermine the integrity of the contracting process

a.   **Defendants Wrongfully Overcharged the Government by Inflating Costs**

125.   Defendants routinely defrauded the Government by inflating cost estimates to artificially overstate the contract value. According to Relators, the NOK Defendants' company-wide standard proposal template inflated fixed costs such as salary for Project Manager, Quality Control, Site Safety and Health Officer, per diem rates, etc.

126.   When employees prepared a bid, they were forced to use the template with inflated costs and could not deviate from those line-item costs without Matthew Yates or Robert Kyrklund's express permission to do so. Further, the NOK Defendants overstated the burden rate and oversight costs in every contract which, as discussed in detail above, the NOK Defendants had no intention of proving oversight on many of its contracts. The Non-8(a) Defendants prepared the NOK Defendants' pre-inflated bids that were submitted to the government.

127.   Defendants' fraudulent scheme to inflate the contract price was realized in connection to several projects.

(i)   *Tyndall Air Force Base - Contract No. W9127819C0044*

128.   Koman Construction knowingly overcharged for direct labor, labor burden, and bond costs on the Tyndall AFB contract.

129.   In the Project Manager section of the Tyndall proposal, Koman Construction charged $123,510.40 annually for a Project Manager. Not a single Project Manager at Koman

Construction was compensated at that rate. Koman Construction also added 36% to that number for labor burden, but in reality, the labor burden was much less than 36%.

130.    Koman Construction's proposal to Tyndall illustrated a $2,450,378.00 cost to Koman Construction for HVAC work (stated Mechanical). Berg's Heating and Air Conditioning ("Berg's") and Koman Construction worked together on the Tyndall proposal. Berg's gave Koman Construction a budget proposal on the HVAC for $3,064,275.00 and $542,949.00 for the plumbing portion.

131.    This was an intentionally inflated number to better position Koman Construction for negotiations, so that Koman Construction could show the Air Force Contracting Officer how it reduced the cost of HVAC to allegedly provide a more competitive number. In fact, Berg's and Koman Construction intentionally inflated the cost of the HVAC work, so it could be later reduced to "show" a price concession. Although Berg's was eventually awarded a contract for much less, they still were positioned to make a large profit on the project.

132.    The contract written to Berg's HVAC was eventually reduced from over 3 million dollars to $1,836,900.00, which gave Koman Construction an estimated profit of $613,478.00 (33.33%). Relator Hicks discussed this excessive profit with Berg's owner, Mark Berg. Berg explained to Relator Hicks that Matthew Yates called him and asked if he would take the job for the awarded contract amount. Berg stated he informed Matthew Yates he would do the job for the contract amount and stated that he would still make good money at that rate.

133.    Air Force contracts typically do not provide for profits in excess of 20%. In the case of the Tyndall AFB contract, Koman Construction, through bid rigging and suppression, profited at a rate in excess of 30% (conservatively). The gross profit for the contract at 30% would have been $2,337,540. At the more reasonable profit rate of 20% the amount of profit would have been

$1,558,360. Koman Construction therefore overcharged the Government, at a minimum, more than $779,180 on this contract alone.

134.    The following are examples of additional overcharges at Tyndall AFB:

| Description | Bid | Allotted | Overcharge |
|---|---|---|---|
| Project Manager Position | $35,152 | $0 | $35,152 |
| Cell Phone Service | $8,500 | $4,250 | $4,250 |
| Hot Spot - Internet | $4,250 | $850 | $3,400 |
| Project Manager Lodging | $3,024 | $0 | $3,024 |
| QC Manager and SSHO Accommodations | $130,900 | | $130,900 |
| | | TOTAL | $176,726 |

135.    Koman Construction charged the government $35,152 for a Project Manager yet did not fill the Project Manager position. Koman Construction only reimbursed $125 for cellphones rather than the bid price $250 per phone. Koman Construction only reimbursed $50 per hot spot instead of the $250 reflected in the proposal. Koman Construction's bid specified separate long-term accommodations for the QC Manager and SSHO at $65,450 apiece, but Koman Construction then refused to allow separate accommodations for the QC Manager and SSHO.

136.    Koman Construction knew that it would not provide separate accommodations when it submitted the bid representing that separate accommodations for the QC Manager and SSHO would be provided. Therefore, the Government should be entitled to recoup the full value.

137.    The value of the Tyndall AFB Contract was $7,791,800. 2.3% of the contract amount were overcharges.

34

(ii)   *Bolling AFB - Contract No. 70B01C19D00000067*

138.   Donley prepared Koman Construction's proposal for the Bolling Air Force Base. The contract shows Koman Construction's proposed prime direct labor with a 39% burden rate.

139.   Like the overcharges in the Tyndall AFB Contract, Koman Construction made no attempts to fill the Project Manager, SSHO, or QC positions.

(iii)   *DHS - Contract No. 70B01C19D00000067*

140.   Koman Construction used the inflated template when bidding on DHS contract no. 70B01C19D00000067. On August 30, 2019, DHS awarded Koman Construction a contract to repair and improve services for TI assets in the Tucson sector. This contract was a year-long, sole-source IDIQ contract where the award totaled $21,495,528.32.

141.   Koman Construction subcontracted to a sister company, Defendant SWP Contracting ("SWP") who likewise used the inflated bid template.  During the bidding process, SWP prepared the subcontract proposal and Matthew Yates directed Koman Construction to approve it. The CBP Program Manager, Jeff Rhodes, believed that SWP was overcharging on work orders, and Koman Construction Program Manager, Allen Sander, expressed his concerns about SWP overcharging on the contract to Matthew Yates.

142.   Another subcontractor on the project, Cerrudo, worked for Koman Construction through SWP and charged far less than SWP. While SWP subcontracted their portion of the work to Cerrudo, Koman Construction communicated with Cerrudo as if Cerrudo was Koman Construction's subcontractor, not SWP's. Further, had Koman Construction subcontracted directly with Cerrudo, or with other companies with lower rates, Koman Construction would have saved the Government money. Even though Koman Construction knew it was getting overcharged by SWP, Koman Construction did nothing about it.

35

143.   Koman Construction also won the following contracts with the inflated bid template and subcontracted work to SWP, despite SWP's overcharges:

| Date Signed | Value | Contract No. | Description |
| --- | --- | --- | --- |
| June 4, 2020 | $20,773,086 | 70B01C20D00000018 | CTIMR PROGRAM COVERING SCHEDULED AND UNSCHEDULED MAINTENANCE ACTIVITIES IN RIO GRANDE VALLEY SECTOR |
| June 16, 2020 | $11,287,593 | 70B01C20D00000022 | COMPREHENSIVE TACTICAL INFRASTRUCTURE MAINTENANCE AND REPAIR PROGRAM COVERING LAREDO SECTOR |
| June 24, 2020 | $13,648,346 | 70B01C20D00000023 | COMPREHENSIVE TACTICAL INFRASTRUCTURE MAINTENANCE AND REPAIR (CTIMR) PROGRAM COVERING THE DEL RIO AND SOUTH BIG BEND SECTORS |

144.   Relator Gomez also discussed SWP's overcharges with Matthew Yates and Mr. Sander. Matthew Yates responded that the overcharges were not a problem, because all funds flowing into SWP ultimately flowed into the parties' parent company, NOK, benefitting everyone's bottom line.

145.   Koman Construction and SWP obtained government contracts through collusive bidding schemes. By inflating the bid for the prime contract and inflating charges for the subcontract, NOK subsidiaries Koman Construction and SWP clandestinely diverted thousands from the value of the contracts to the detriment of the government.

146.   Because Koman Construction and SWP maintained public contracts at inflated prices, all claims for payment under those fraudulently obtained contracts were made in violation of

the FCA. Had the government known Koman Construction and SWP's contract prices were inflated due to the Defendants' fraudulent conduct, the contracts would never have been awarded, and the claims submitted under the contracts wouldn't have been paid.

**b.  Defendants Engaged in Bid Rigging and Complementary Bidding**

(i)  *Tyndall Air Force Base - Contract No. W9127819C0044*

147.   Koman Construction was awarded a contract for work at Tyndall Air Force Base (contract no. W9127819C0044) on September 29, 2019 in the amount of $7,791,800.69. Relator Hicks was the Project Manager on the Tyndall Air Force Base contract, and he had an electrical subcontractor, Weaver Electric, that he had worked with for many years. Relator Hicks invited Jeremy Holland at Weaver to submit a bid for the electrical portion of the project. Mr. Holland came to Tyndall, along with other subs and the design team, to learn about the project and assist the design team with the design. He worked with the design team and spent many hours developing a proposal for the electrical portion of the project.

148.   Mr. Yates was working to form Defendant Koman Advantage ("KA") at this time. As soon as KA was created, Koman Construction subcontracted the electrical work on the Tyndall Air Force Base to KA. Koman Construction Executive Program Manager and Relator Hicks' supervisor, Tom Berrett, later told Relator Hicks that the award to KA was for a larger amount than the proposal from Weaver.

149.   Additionally, during the bidding process for the Tyndall Air Force Base contract, the Government Contracting Officer, Kyle M. Rodgers, asked Koman Construction to supply additional cost data from its subcontractors or provide letters from subcontractors declining to bid ("no-bid letters"). Matthew Yates, former General Manager of Koman Construction who moved to KA, asked Robert Kyrkland to procure the cost justification data in the form of no-bid letters.

150. Robert Kyrkland informed Relator Gomez that Koman Construction was to submit validation numbers from subcontractors or letters stating they were not interested in bidding. Laughing, Kyrklund told Relator Gomez that he asked HWH, BFL, and L&J for no-bid letters.

151. Robert Kyrklund did not actually try to get bids, he simply asked the three subcontractors for no-bid letters.

152. According to Relators, no-bid letters are typically requested by a general contractor to illustrate due diligence by Koman Construction. When a sole source proposal, such as the one submitted by Koman Construction for the Tyndall AFB contract, exceeds the Government's Rough Order of Magnitude ("ROM") anticipated costs, the Contracting Officer will typically request multiple subcontractor proposals or no-bid letters to justify the cost.

153. Koman Construction fraudulently arranged for, received, and submitted letters from L&J, BFL, and HWH, all declining to bid. These no-bid letters were solicited from companies maintaining less than arms-length relationships with Matthew Yates and Koman Construction.

154. The no-bid letter from Defendant L&J is notably problematic. As discussed in more detail in the following section, L&J was created by Matthew Yates' wife, Jean Yates. Matthew Yates –former General Manager of Koman Construction who was working at KA - electronically signed Lucas Robinson's name on L&J's declination letter. However, Lucas Robinson was no longer employed at L&J.[22] Moreover, the Microsoft word properties of the L&J declination letter show it was created by Matthew Yates.[23]

155. The sole purpose of the no-bid letters was to justify a higher contract award, causing the Air Force to pay more than was necessary.

---

[22] *See* **Exhibit 44** – September 10, 2019 L&J Declination Letter
[23] *See* **Exhibit 45** – Screenshot of document properties

156. Koman Construction and KA knowingly made misrepresentations to the government concerning their anticipated costs. The subcontract to KA was predicated on misrepresentations to the government concerning the fraudulently obtained no bid letters that were used by Koman Construction to falsely give the appearance of competition. Koman Construction and KA submitted and/or caused to be submitted claims for payment for contracts procured by fraud.

157. Koman Construction and KA, through their fraudulent course of conduct, induced the government to award contracts the government would not have otherwise entered. All claims submitted or caused to be submitted by Koman Construction and/or KA under the Tyndall Air Force Base contract awarded as a result of false representations concerning Defendants' anticipated costs and profit are false and fraudulent claims on the United States.

158. All claims submitted or caused to be submitted by Koman Construction and/or KA under the Tyndall Air Force Base contract awarded as a result of Defendants' false representations concerning the fraudulently obtained no-bid letters are likewise false and fraudulent claims on the United States.

159. Because Defendants obtained and maintained government contracts at inflated prices through kickback schemes, bid rigging, and complementary bidding, all claims for payment under the fraudulently obtained contracts were made in violation of 31 U.S.C. §3729(a)(1).

### c. **Koman Construction's General Manager awarded subcontracts to a company owned by his wife**

160. Matthew Yates, former General Manager of Koman Construction, conspired to defraud the Government by engaging in an illicit business relationship with his wife, Jean Yates, sister-in-law Rita Garris, Lucas Robinson, and Ricky Robinson. As General Manager of Koman

Construction, Matthew Yates had the authority to steer subcontracts to the business entity of his choosing.

161.   Matthew Yates directed his wife, Jean Yates, to established Defendant L&J for the sole purpose of funneling subcontracts from Koman Construction. From the outset, L&J falsely represented its qualifications to serve as a subcontractor. Matthew Yates coordinated for Lucas Robinson, a service-disabled veteran, to join L&J. Notably, Matthew Yates previously worked with Ricky Robinson, Lucas Robinson's brother, at other companies. Ricky Robinson had a subcontracting relationship with Koman Construction through his previous work with BFL Construction. Ricky Robinson also served as the manager for Defendant KA from March 2020 to January 2023.

162.   Jean Yates had no prior self-performance construction experience when she formed L&J.  Lucas Robinson likewise had very little knowledge of construction and was brought into the conspiracy as a "straw" corporate officer to conceal the fact that Matthew Yates' wife owned L&J. Lucas Robinson was given the title of President and signed all contractual documents on behalf of L&J so as not to draw attention to the Yates and their illicit business relationship.

163.   The NOK Defendants took Lucas Robinson, his wife Brittany, and several others on a fishing trip to Alaska in June of 2019. While there, Lucas Robinson told Relator Hicks that he was essentially brought on to be a straw man at L&J. Koman Construction paid for all flights, hotels, outings, and food during this trip. Matthew Yates and Robert Kyrklund were also in attendance.

164.   Relator Gomez recalls that Matthew Yates advised Koman Construction that they were going to use L&J for subcontract work in Texas. Matthew Yates told her Lucas Robinson was "a service-disabled veteran and [Yates] wanted to help out his company."  Matthew Yates

40

failed to disclose that his wife owned L&J. Ricky Robinson failed to disclose his brother was pretending to be the president of L&J.

165. Matthew Yates represented to Relator Gomez that Jean Yates was only helping L&J on the business side of things so it would be easier for Lucas Robinson, but Jean Yates was not getting paid for her assistance. A lie.

166. When Koman Construction learned about Matthew Yates' relationship with L&J, Matthew Yates assured the President and CEO of Natives of Kodiak, Jim Erickson, that his wife did not own L&J and that she was thinking of purchasing it. Another lie.  Jim Erickson told Matthew Yates that Koman Construction could not subcontract to L&J if Jean Yates was the owner.

167. Koman Construction, by and through Matthew Yates, conspired with L&J to circumvent the fair bid process. Despite L&J's glaring lack of qualifications, Jean Yates owned L&J from the outset. Matthew Yates, in his capacity as General Manager of Koman Construction, improperly awarded subcontracts to L&J for the purpose of diverting government funds for the Yates' personal gain.

168. Almost immediately after L&J was formed, Koman Construction began awarding subcontracts to L&J. Koman Construction did not seek any other bidders for the subcontracts awarded to L&J.

(i)   *DHS Contract - 70B01C18C-00000170*

169. On September 14, 2018, Koman Construction submitted an inflated proposal on a Department of Homeland Security (DHS) project to provide construction repairs for Customs and Border Protection (CBP) property located in Eagle Pass, Texas.

170.    Jean Yates created L&J on September 19, 2018.  On September 21, 2018, DHS awarded a $1,012,018.00 contract to Koman Construction to provide construction repairs to the Eagle Pass property. Without seeking other bids on the subcontract, Matthew Yates approved a subcontract award to L&J in the amount of $587,850.00 for work on the Eagle Pass DHS prime contract on November 1, 2018. [24]

171.    Relator Gomez recalls L&J did not complete all the work under the contract. Koman Construction hired the laborers and performed other assigned L&J tasks on the Eagle Pass project. Grant Ellison, accounting manager at Koman Holdings, advised Relator Gomez that the deductive modifications to the L&J subcontract were not nearly enough to cover Koman Construction's costs to finish the project for L&J. Simply, the government paid L&J for work it did not complete.

(ii)    *DHS Contact - 70B01C18C-00000160*

172.    Koman Construction  improperly awarded a subcontract to L&J to perform work on DHS contract number 70B01C18C-00000160. On September 17, 2018, Koman Contruction submitted an inflated proposal to DHS on a project to provide infrastructure and building repairs of CBP property in San Angelo, Texas. Jean Yates founded L&J two days later on September 19, 2018.

173.    On September 27, 2018, DHS awarded Koman Construction DHS contract number 70B01C18C-00000160  totaling  $1,732,291.00. Without  obtaining  additional  bids, Koman Construction approved a subcontract award to L&J in the amount of $261,376.14 for work on the San Angelo DHS prime contract on December 19, 2018. [25]

(iii)    *DoD ACOE Contract –W912P2-18-D-0041*

---

[24] *See* **Exhibit 2** - November 1, 2018 subcontract between Koman Construction and L&J
[25] *See* **Exhibit 3** - December 19, 2018 subcontract between Koman Construction and L&J

174.    Koman Construction improperly awarded a subcontract to L&J to perform work on Department of Defense ("DoD"), Army Corps of Engineers ("ACOE") contract number W912P2-18-D-0041. On September 30, 2018, Koman Construction was awarded a POCA IDIQ contract to provide a facilities upgrade at the Yuma Proving Grounds in Yuma, Arizona. The contract award totaled $2,000,000.00, and the task order, number W912P2-18F-0184, totaled $249,888.00.

175.    Without considering other subcontracting bids, Matthew Yates approved a subcontract award to L&J in the amount of $110,019.18 for work on the Yuma DoD prime contract.[26]

(iv)    *DoD ACOE Contract – El Paso CPC Modular Project*

176.    Koman Construction improperly awarded subcontracts to L&J to perform work on DoD ACOE contract numbers W9126G-19C-0025 and W9126G-19C-0027. The following timeline summarizes key events related to Koman Construction's improper subcontract award(s) to L&J:

---

[26] *See* **Exhibit 4** - April 10, 2019 subcontract between Koman Construction and L&J

| Date | Description |
|---|---|
| May 6, 2019 | Koman Construction is awarded DoD ACOE contract number W9126G-19C-0025 to perform work on the El Paso CPC Modular Project in El Paso, Texas. The contract award totaled $21,884,014.91.<br><br>*See* **Exhibit 5** - Contract Award, Specifications & Drawings and Solicitation, Offer, and Award for contract number W9126G-19C-0025 |
| May 10, 2019 | Koman Construction is awarded DoD ACOE contract number W9126G-19C-0027 to perform work on the El Paso Modular Project. The contract award totaled $15,282,372.23.<br><br>*See* **Exhibit 6** - May 10, 2019 El Paso Modular Project Prime Contract, no. W9126G-19C-0027 |
| May 22, 2019 | Contract number W9126G-19C-0025 is modified.<br><br>*See* **Exhibit 7** - May 22, 2019 modification A00001 to contract number W9126G-19C- 0025 |
| June 10, 2019 | Contract number W9126G-19C-0025 is modified.<br><br>*See* **Exhibit 8** - June 10, 2019 modification P00001 to contract number W9126G-19C- 0025 |
| July 12, 2019 | Contract number W9126G-19C-0025 is modified, and the contract's award is increased by $241,456.00, bringing the award's total value to $22,125,470.91.<br>*See* **Exhibit 9** - July 12, 2019 modification A00002 to contract number W9126G-19C-0025 |
| July 30, 2019 | Koman Construction approves a subcontract award to L&J for window installation as part of prime contract no. W9126G-19C-0027.<br><br>*See* **Exhibit 10** - Statement and Acknowledgement for subcontract number FTW-ELP- 0027-08000 |
| August 9, 2019 | Contract number W9126G-19C-0025 is modified.<br><br>*See* **Exhibit 11** - August 9, 2019 modification P00002 to contract number W9126G- 19C-0025 |
| September 3, 2019 | Contract number W9126G-19C-0025 is modified, and the contract's award is increased by $365,556.93, bringing the award's total value to $22,491,027.84.<br>*See* **Exhibit 12** - September 3, 2019 modification A00003 to contract number W9126G-19C-0025 |
| September 18, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $2,318.65, bringing the award's total value to $22,493,346.49.<br><br>*See* **Exhibit 13** - September 18, 2019 modification A00004 to contract number W9126G-19C-0025 |

| September 20, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $36,159.64, bringing the award's total value to $22,529,506.13. *See* **Exhibit 14** - September 20, 2019 modification A00005 to contract number W9126G-19C-0025 |
|---|---|
| September 24, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $44,781.17, bringing the award's total value to $22,574,287.30. *See* **Exhibit 15** - September 24, 2019 modification A00006 to contract number W9126G-19C-0025 |
| September 30, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $65,767.65, bringing the award's total value to $22,640,054.95. *See* **Exhibit 16** - September 30, 2019 modification A00007 to contract number W9126G-19C-0025 |
| October 30, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $410,000.00, bringing the  award's total value  to $23,080,996.96. *See* **Exhibit 17** - October 30, 2019 modification P00003 to contract number W9126G-19C-0025 |
| September 18, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $2,318.65, bringing the award's total value to $22,493,346.49. *See* **Exhibit 13** - September 18, 2019 modification A00004 to contract number W9126G-19C-0025 |
| September 20, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $36,159.64, bringing the award's total value to $22,529,506.13. *See* **Exhibit 14** - September 20, 2019 modification A00005 to contract number W9126G-19C-0025 |
| September 24, 2019 | Contract number W9126G-19C-0025 is modified, and the award is increased by $44,781.17, bringing the award's total value to $22,574,287.30. *See* **Exhibit 15** - September 24, 2019 modification A00006 to contract number W9126G-19C-0025 |

177.    FAR regulations prescribe the proper course of action for conflicts of interest in government contracting. Matthew Yates and L&J intentionally failed to disclose their clear conflict(s) of interest.  Further 3452.209-70 requires an offeror to provide disclosure on any actual

45

or potential conflict of interest (or apparent conflict of interest) regardless of their opinion that such a conflict or potential conflict (or apparent conflict of interest) would not impair their objectivity. L&J failed to do so here.

## IX.
## RETALIATION AGAINST RELATORS

A.      **The NOK Defendants unlawfully retaliated against Relator Christopher Hicks.**

178.    Relator Christopher Hicks managed projects at Koman Construction for several years and witnessed Koman Construction's fraud up close on many occasions. Mr. Hicks refused to participate in Koman Construction's fraudulent behavior, actively spoke up about it and tried to stop it multiple times. As a result, Mr. Hicks' superiors waged a campaign of retaliation against him.

179.    The retaliation against Mr. Hicks began in March 2020. On February 26, 2020, Grant Ellingson, Accounting Manager at Koman Holdings, contacted Mr. Hicks' immediate supervisor, Koman Executive Program Manager Tom Berrett, and told him to complete a questionnaire regarding the Joint Base Anacostia-Bolling (JBAB) contract for Koman Construction's 2019 financial statement audit.[27] Mr. Berrett then asked Mr. Hicks to complete the questionnaire.

180.    On March 3, 2020, Mr. Hicks called Mr. Berrett and told him he could not complete the questionnaire for reasons that Mr. Berrett understood. The main reason that Mr. Hicks could not complete the questionnaire was that Koman Construction was not truly managing the project as its subcontractor, Donley, handled all aspects of the project. Mr. Hicks then sent an email to Mr. Berrett following up on the phone call and telling him that he could not accurately complete

---

[27] *See* **Exhibit 21** - February and March 2020 emails with subject line "Mini- JOC (Job 10019) – Executed Base Contract and PM Questionnaire"

46

the questionnaire due to his lack of time at JBAB and "other extenuating circumstances."[28] On March 4, 2020, Donley employees completed the questionnaire and Tom Berrett subsequently sent it to corporate.[29]

181.    Mr. Hicks additionally spoke up about fraud related to the Tyndall Air Force Base project, for which he was the Project Manager. Koman Construction subcontracted the electrical work to KA, but Matthew Yates told Mr. Hicks and his team to complete a light count, which involved reviewing the electrical plans in the subcontract and counting the number and placement required.

182.    Mr. Hicks told Mr. Berrett KA should do the light count because KA had the contractual obligation and should assume the risk. Further, Mr. Hicks communicated that his team was not qualified for the task. Mr. Berrett told Mr. Hicks to perform the light count or else he would be looking for a job.

183.    Chad Thompson, one of Mr. Hicks' subordinates, provided Mr. Hicks with a light count, which Mr. Hicks then forwarded to Matthew Yates. Mr. Yates called Mr. Hicks and threatened his job, telling him the light count was incorrect. Robert Kyrklund and Ricky Robinson were also present for the call.

184.    The abusive call from Mr. Yates was the last straw. On March 13, 2020, Mr. Hicks sent a formal complaint against Mr. Yates to Jim Erickson, President and CEO of Koman Holdings, Mike Taylor, Safety Director of Koman Holdings, and Mr. Berrett.[30] Immediately after reading

---

[28] *Id.*

[29] *See* **Exhibit 22** - March 4, 2020 e-mail with subject line "Financial Audit from Corporate"

[30] *See* **Exhibit 23** - March 13, 2020 e-mail with subject "Formal Complaint against Matthew Yates and Natives of Kodiak"

Mr. Hicks' complaint, Mr. Berrett called Mr. Hicks and asked him if he was a "f***ing idiot." Mr. Hicks then contacted HR.[31]

185.    On March 16, 2020, Mr. Hicks spoke with Allyson Thomas in HR and described the hostile and retaliatory work environment he was subjected to; including instances where Mr. Hicks witnessed his superiors using racial slurs. He gave Ms. Thomas a list of witnesses, including Relator Angela Gomez. He also provided a list of positions for which he was not considered, because he was never told about the openings.[32]

186.    On March 30, 2020, Ms. Thomas informed Mr. Hicks her "investigation" was complete, even though she did not interview all of his witnesses, including Ms. Gomez. Mr. Hicks questioned the thoroughness of the investigation and asked how he was supposed to work in such a hostile environment. Ms. Thomas responded by sending Mr. Hicks a flyer for the Employee Assistance Program, telling Mr. Hicks he could use the program as a resource to learn to manage "difficult conversations."[33] Thus, in response to his complaints about the hostility he regularly received for not participating in fraud, Mr. Hicks was told he needed to improve his communication skills. Mr. Hicks inquired further, and on April 1, 2020, Ms. Thomas reiterated that her investigation did not "provide evidence of a hostile and discriminatory work environment."

187.    *One day later*, on April 2, 2020, Mr. Berrett told Mr. Hicks that he was being taken off the Tyndall Air Force Base project. On April 3, 2020, Deena Hardin with HR and Mr. Berrett told Mr. Hicks that he was being placed on a Performance Improvement Plan (PIP). Ms. Hardin told Mr. Hicks that he was not performing in accordance with his job description. Mr. Hicks told

---

[31] *See* **Exhibit 24** - March 13, 2020 e- mail from Allyson Thomas to Christopher Hicks
[32] *See* **Exhibit 25** - March 23, 2020 e-mail from Christopher Hicks to Allyson Thomas
[33] *See* **Exhibit 26** - E-mail from Allyson Thomas to Christopher Hicks attaching EAP flyer); *see also* **Exhibit 27** - EAP flyer

her that when he began working with Koman Construction in September of 2016, there was no job description, and he had never been made aware of one.

188.    On April 4, 2020, Mr. Hicks sent an e-mail to Mike Taylor, Jim Erickson, and Tom Berrett complaining about the retaliatory treatment he was being subjected to following his formal complaint.[34]

189.    Mr. Hicks received a copy of the PIP on April 6th, which was dated April 2nd.[35] The PIP lobbed untrue and unfounded criticism of Mr. Hicks' ability to handle complex projects. All the while, Koman Construction kept Mr. Hicks on the NOAA projects, contradicting its own fictitious disparagement [36] Mr. Hicks immediately sent an e- mail to Mike Taylor, Jim Erickson, and Tom Berrett regarding the original complaint, the sham investigation, and the resulting retaliation. Mr. Erickson then called Mr. Hicks and said he did not contact him earlier, because he did not want to appear biased during the investigation. Mr. Hicks respectfully disagreed with the investigation and Mr. Erickson's decisions during the phone call and in a subsequent e-mail exchange.[37]

190.    The allegations concerning Mr. Hicks' job performance were meritless, and the PIP was a deliberate attempt to silence and punish him for refusing to participate in Koman Construction's fraud. For example, the PIP states that Koman Construction would evaluate Mr. Hicks projects 30, 60, and 90 days after signing the PIP. As of the time this lawauit was filed, Mr. Hicks was never evaluated. Furthermore, the PIP claimed Mr. Hicks was to participate in weekly

---

[34] *See* **Exhibit 28** - April 4, 2020 e-mail from Christopher Hicks to Mike Taylor, Jim Erickson, and Tom Berrett.

[35] *See* **Exhibit 29** - April 2, 2020 Performance Improvement Plan for Christopher Hicks

[36] In fact, Mr. Berrett e-mailed Mr. Hicks on September 21, 2020 and told him that he knew Koman Construction would get more contracts with NOAA if Mr. Hicks was the lead on the project. *See* **Exhibit 34** (September 21, 2020 e-mail from Tom Berrett to Christopher Hicks).

[37] *See* **Exhibit 30** - April 6, 2020 e-mail exchange between Christopher Hicks and Jim Erickson

calls regarding progress on his projects, but those weekly calls never took place.

191.    The fact Koman Construction failed to meet the terms of its own PIP shows Koman Construction never implemented the PIP for the purpose of correcting Mr. Hicks' performance. Instead, it was a tool in Koman Construction's targeted retaliation of Mr. Hicks.

192.    In June of 2020, Mr. Hicks prepared a proposal for a complex project at a facility owned by the National Oceanic and Atmospheric Administration (NOAA). Prior to submitting the proposal, Mr. Hicks had several conversations with the Contracting Officer, Chris Mackie, regarding the organization of the proposal, because Mr. Hicks was concerned Koman Construction's proposal would look unnecessarily complicated if organized as NOAA requested. Mr. Mackie told Mr. Hicks to deliver the information in a format that would be easier to comprehend, which Mr. Hicks did. Koman Construction submitted the proposal on June 5, 2020.

193.    In response, Mr. Hicks' superiors told him the format of the proposal was incorrect. Koman Construction refused to listen to Mr. Hicks as he explained that Mr. Mackie, as the contracting officer, discussed the organization of the proposal and told Mr. Hicks he could organize the proposal as he did.  Mr. Hicks contacted Mr. Mackie about Koman Construction's response on June 10, 2020, and Mr. Mackie asked him to resubmit the proposal using the format originally requested.[38]

194.    On June 20, 2020, Tom Berrett and a Koman Construction HR representative, Deena Hardin, called Mr. Hicks and told him he was being demoted to Project Manager. They refused to give Mr. Hicks a reason and then told him his projects were now limited to the NAS Jacksonville project, any work at NAS Belle Chasse, and the NOAA projects in Miami.

195.    On June 22, 2020, Mr. Hicks sent an e-mail to follow up and clarify Mr. Hicks was

---

[38] *See* **Exhibit 31** - June 10, 2020 e-mails with subject "AOML Hurricane Repairs".

only responsible for employees working on the NAS Jacksonville project or the NOAA projects in Miami, even though there were "no other employees assigned to these projects as of 6/22/20."[39] Mr. Berrett confirmed that Mr. Hicks would only have a few projects going forward and that he would not have anyone to supervise. *Id.*

196.    In August 2020, Mr. Hicks learned that Mr. Mackie was no longer the Contracting Officer on the NOAA projects. A NOAA employee called Mr. Hicks on August 24, 2020 and told him that the proposal Koman Construction submitted on June 5, 2020 was difficult to comprehend, confirming the validity of the concerns Mr. Hicks previously raised. Mr. Hicks explained that he initially sent a different version he thought was easier to understand, and the NOAA employee asked him to send the original proposal to the new Contracting Officer, Tania Gates. Mr. Hicks asked Mr. Berrett's permission to send the original proposal, reminding Mr. Berrett that his prior response was unwarranted considering NOAA now wanted the original proposal. Mr. Berrett gave Mr. Hicks permission to send the original proposal, which Mr. Hicks did on August 25, 2020.[40]

197.    Mr. Hicks' superiors continued to retaliate against Mr. Hicks by needlessly harassing him with fabricated complaints about his job performance. However, Mr. Hicks was an exemplary employee and achieved multiple accomplishments after his demotion. For example, Mr. Hicks was instrumental in securing more awards from NOAA.  Mr. Hicks completed the project at NAS Jacksonville, a client he secured without help from anyone at Koman Construction. Mr. Hicks finished the project on time and under budget. At the time of filing this Complaint, Mr. Hicks was told Koman Construction would get another project from NAS Belle Chasse in the fall for the

---

[39] *See* **Exhibit 32** - June 22, 2020 e-mails with subject "Demotion Questions".
[40] *See* **Exhibit 33** -August 25, 2020 e-mail from Mr. Hicks to Tania Gates.

final stage of the hangar 3 window replacement. Mr. Hicks' superiors' accusations of poor job performance were meritless.

198.   Furthermore, the proposals Koman Construction sent NOAA after Mr. Hicks' demotion were sloppy and riddled with misspellings and left-over language from proposal templates that should have been deleted. The fact Koman Construction allowed Mr. Hicks' replacement to submit unashamedly careless work is further proof Koman Construction did not actually demote Mr. Hicks for poor job performance.

199.   Koman Construction spent months retaliating against Mr. Hicks because he spoke up about the fraud and refused to participate in it. His superiors harassed and demoted him. Chris Hicks was constructively discharged in August of 2020.

**B.     The NOK Defendants unlawfully retaliated against Relator Angela Gomez.**

200.   Koman Construction hired Relator Angela Gomez in October 2017. There, she served as Business Manager until her constructive discharge on July 9, 2020.

201.   Ms. Gomez was subjected to sex discrimination, a hostile work environment, and retaliation while working for Koman Construction. The retaliation stemmed from Ms. Gomez's complaints that Koman Construction's discriminatory hiring and employment practices violated the terms of its federal contracts, which prohibit Koman Construction from discriminating against women and minorities as a condition of receiving federal funds.

202.   Mr. Kyrklund and Mr. Yates commented on multiple occasions that "girls shouldn't be in construction," and they subjected female employees, including Ms. Gomez, to a hostile work environment. Women were excluded from company events and were denied raises and promotions. Mr. Yates and Mr. Kyrklund also made racially discriminatory comments and harassed an employee for his religious beliefs.

203.    Koman Construction's hiring practices were also discriminatory. For example, in July 2019, Mr. Kyrklund interviewed a woman for a Project Manager position. He told Ms. Gomez that the candidate was highly qualified, but that he wanted to make her an office assistant instead. Ms. Gomez protested that the woman had applied for a managerial position and should have a managerial title. Mr. Kyrklund instead hired the woman as "Bid Coordinator" and gave her the same responsibilities as a manager.

204.    Ms. Gomez complained about management's discriminatory practices and hostile work environment multiple times. For example, on February 14, 2020, Ms. Gomez contacted the NOK Defendants' human resources representative Deena Hardin.[41] Ms. Gomez expressed her concerns about gender bias, discrimination against minorities and women, and Koman Construction's lack of compliance with federal law and the terms of federal contracts.

205.    On February 19, 2020, Mr. Kyrklund and Mr. Yates pulled Ms. Gomez into a meeting and accused her of showing favoritism to women and "making a big deal" out of "veteran and female issues." Ms. Gomez advised Mr. Yates and Mr. Kyrklund that these were contract compliance issues and Koman Construction was contractually required to do all it could to promote women, minorities, and veterans. Mr. Kyrklund sat there smirking, and told Ms. Gomez things were fine. Mr. Yates then told Ms. Gomez that some of her job duties were being removed and that Deena Hardin from HR would take over as Office Manager.

206.    Later that day, Ms. Gomez spoke with Aronca Robinson, Corporate Compliance Manager for Koman Holdings, and told Ms. Robinson about the gender bias and lack of contract

---

[41] Deena Hardin worked for both Koman Sustainable Solutions and Koman Construction, LLC. According to Ms. Hardin's LinkedIn, she worked as a Business Manager for Koman Sustainable Solutions from June 2020 – July 2023. She also served as a Business Manager for Koman Construction from December 2019 – June 2023.

compliance. Ms. Robinson confirmed that there was a concern. Ms. Gomez also emailed Ms. Robinson on February 20, 2020 and asked her to pursue her concerns on a higher level. Ms. Robinson confirmed during a subsequent call that she received Ms. Gomez's e-mail and would follow up with Jim Erickson, NOK's CEO. A couple of weeks later, the NOK Defendants gave raises to Ms. Gomez's co-workers, but not to her.

207.    On March 24, 2020, Mr. Yates, Mr. Kyrklund, and Ms. Hardin ambushed Ms. Gomez with another hostile meeting. They accused Ms. Gomez of being confrontational during executive meetings and "having issues" with Ms. Hardin. Ms. Gomez told them that their real problem with her was that she would not "shut up" about the discrimination. Ms. Gomez was written up after the call.

208.    On April 2, 2020, Ms. Gomez contacted Mr. Erickson and again expressed her concerns about the ongoing discrimination and Koman Construction's (non)compliance with the terms of its federal contracts.  Mr. Erickson advised he would instruct Amanda from HR to follow up on the issue. Mr. Erickson also advised he would relay Ms. Gomez's concerns to Tracy Kerns, COO of Defendant Koman Holdings.

209.    Ms. Gomez spoke with Amanda from HR on April 7, 2020 and April 22, 2020. During each call, Amanda promised she would follow up on Ms. Gomez's concerns. She never did.

210.    The retaliation continued to worsen, and Ms. Gomez hired an attorney. On April 24, 2020, Ms. Gomez's attorney sent a letter to Mr. Erickson detailing the retaliatory and discriminatory conduct the NOK Defendants subjected Ms. Gomez to.

211.    In response, the NOK Defendants immediately placed Ms. Gomez on administrative leave. Koman Construction wouldn't be deterred. Instead, Koman Construction

54

continued to retaliate against Ms. Gomez while she was on leave.

212.    On May 15, 2020, one of Ms. Gomez's family members was fired, and another family member was continually harassed.

213.    On May 29, 2020, Ms. Gomez was told that the investigation was complete and that she should return to work, which she did on June 1, 2020. The day after returning to work, the COO of Defendant Koman Holdings, Tracy Kerns, hauled Ms. Gomez into a meeting and harassed Ms. Gomez about a family business, Steve Gomez Installation (SGI). Ms. Kerns told Ms. Gomez that her association with the business was supposedly a conflict of interest. The accusation, like so many representations by the NOK Defendants, was meritless.

214.    SGI was an entity in name only after Ms. Gomez's father decided he was no longer interested in having the business.  He had not performed work in years. SGI did not even have a bank account. Further, Koman Construction's management knew about SGI when Ms. Gomez was hired, as she included her family's business on her resume.

215.    On June 3, 2020, Ms. Gomez was subjected to yet another hostile meeting, this time about another alleged conflict of interest. The meetings and accusations were nothing more than an effort to intimidate Ms. Gomez for requesting an investigation into Koman Construction's discriminatory practices. Ms. Gomez was not fired but was told that she should not return to work, and she was forced to use her PTO. While Ms. Gomez was on leave, Koman Construction refused to provide verbal employment verification to a mortgage provider, even though Ms. Gomez was still employed.

216.    Several weeks after the meeting, Ms. Gomez informed Koman Construction in a letter that no reasonable employee could continue to work at Koman Construction after experiencing discrimination and retaliation based on raising concerns about sex discrimination,

55

unequal pay based on sex, and Koman Construction's unlawful contracting practices. Ms. Gomez was constructively discharged on July 9, 2020.

217.    The NOK Defendants repeatedly violated federal laws prohibiting discrimination, as well as the terms of the contracts at issue in this case, which require compliance with anti-discrimination laws. Ms. Gomez suffered harassment, retaliation, and financial and emotional harm due to her efforts to stop Koman Construction's rampant, and illegal, discrimination.

**X.**
**ACTIONABLE CONDUCT BY DEFENDANTS**

**A.    False Claims Act**

  **1.    Applicable Law**

218.    This is an action to recover damages and civil penalties on behalf of the United States and Relators arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

219.    The FCA provides that any person who

  (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or

  (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

  (C)    conspires to defraud the Government by committing a violation of [the FCA]

is liable to the Government for a civil penalty of not less than $11,665 and not more than $23,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

220.    The FCA defines "claim" as:

  (A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property,

56

that--

   (i)   is presented to an officer, employee, or agent of the United States; or

   (ii)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

      (I)   provides or has provided any portion of the money or property requested or demanded; or

      (II)  will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. .

31 U.S.C. §3729(b)(2).

221.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects whistleblowers who have suffered retaliation because of their efforts to stop one or more violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

222.    Based on these provisions, Relators, on behalf of the United States and on their own behalf, seek through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**2.    Defendants' Violations of the False Claims Act**

    **a.    <u>Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))</u>**

223.    From 2015 to the present, Defendants have knowingly presented false or fraudulent claims associated with multiple federal contracts, including those specified herein.

224.    Specifically, Defendants have engaged in bid rigging and awarded subcontracts without fair competition. Rather than awarding subcontracts to companies that offered the best value to the Government, Defendants KA and Koman Construction instead selected companies that did not, even taking turns subcontracting with one another. Furthermore, Koman Construction

57

and KA have failed to supervise or meaningfully participate in projects subcontracted to Donley and Boxx. Defendants also paid and/or received kickbacks in an effort to exert undue influence over the contracting process.

225. The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors to secure preferential treatment within the FAR-regulated contracting process. The illicit award of a subcontract to an improperly vetted vendor in an attempt to enrich oneself is considered "anything of value" and constitutes a kickback under the Anti-Kickback Act. Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

226. Defendants' interference with the contracting process and other collusive activities that run afoul of FAR also violated the False Claims Act. Companies are required to comply with FAR when bidding on contracts and performing contracts.

227. FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

228. Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make payments for services that it would not have made had it known the companies performing these services were offering or receiving kickbacks and/or were colluding during the bidding process.

229.    Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' failure to comply with FAR, as well as Defendants' corrupt provision and/or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

230.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the potential to influence the payment decisions of the Government. Because of their fraudulent representations, Defendants earned millions of dollars to which they were not legitimately entitled. The ultimate submission to the Government of false claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.

231.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**b.    <u>Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))</u>**

232.    From 2015 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly and impliedly, that their statements were true, accurate, and correct.

233.    Defendants' express and implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for

which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

234. Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. All of these certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind contracts or subcontracts.

235. Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

c.    **Conspiracy (31 U.S.C. § 3729(a)(1)(C))**

236. By planning and implementing their schemes, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

237. FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

238.    Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of kickbacks in exchange for business and was material to the Government's loss.

239.    Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

240.    Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

### d.    **Defendants' Retaliation Against Relators**

241.    Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

(1)    Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

(2)    Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 .S.C. § 3730(h).

61

242.     As discussed *supra*, the NOK Defendants retaliated against Relators because of their efforts to stop Koman Construction, and the remaining NOK Defendants, from defrauding the Government in violation of the False Claims Act.

243.     Relators have suffered economic loss and sustained special damages because of the NOK Defendants' retaliatory acts and are entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XI.
## CAUSES OF ACTION

**A.     Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

244.     Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

245.     From 2015 to the present, Defendants have knowingly presented false or fraudulent claims associated with multiple federal contracts, including those specified herein.

246.     Specifically, Defendants have engaged in bid rigging and awarded subcontracts without fair competition. Rather than awarding subcontracts to companies that offered the best value to the Government, Defendants KA and Koman Construction instead selected companies that did not, even taking turns subcontracting with one another. Furthermore, Koman Construction and KA have failed to supervise or meaningfully participate in projects subcontracted to Donley. Defendants also paid and/or received kickbacks in an effort to exert undue influence over the contracting process.

247.     The provision of kickbacks between a prime contractor and its subcontractors is a violation of the Federal Anti-Kickback Act of 1986 and the FAR. The Anti-Kickback Act forbids the provision of "anything of value" between a prime contractor and its subcontractors to secure preferential treatment within the FAR-regulated contracting process. The illicit award of a

subcontract to an improperly vetted vendor in an attempt to enrich oneself is considered "anything of value" and constitutes a kickback under the Anti-Kickback Act. Claims tainted by violations of the Anti-Kickback Act are false or fraudulent claims prohibited under the False Claims Act.

248.   Defendants' interference with the contracting process and other collusive activities that run afoul of FAR also violated the False Claims Act. Companies are required to comply with FAR when bidding on contracts and performing contracts.

249.   FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

250.   Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States to make payments for services that it would not have made had it known the companies performing these services were offering or receiving kickbacks and/or were colluding during the bidding process.

251.   Defendants' violations of the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' failure to comply with FAR, as well as Defendants' corrupt provision and/or receipt of kickbacks, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

252.   Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the

potential to influence the payment decisions of the Government. Because of their fraudulent representations, Defendants earned millions of dollars to which they were not legitimately entitled.

253.    Any business that seeks to do business with the government must complete and sign a FAR report that contains representations and certifications relating to the businesses' eligibility to participate in certain government programs.

254.    The Defendants submitted false claims to the government in the form of invoices on its unlawfully obtained contracts, which impliedly certified that the NOK Defendants performed the minimum 15% amount of work as required by the contracts.

255.    The intentional misrepresentations regarding the NOK Defendants' compliance with the performance requirements contained in the certifications submitted to the government were false withing the meaning of the FCA.

256.    Defendants submitted claims for payment(s) to the government that were, in whole or in part, based on the Defendants' knowledge that they misrepresented their compliance with performance requirements and were accordingly false within the meaning of the FCA.

257.    These misrepresentations were made knowingly and with the intent to cause the submission of false claims to the government.

258.    The United States government paid the Defendants based on their false claims and certifications, and as a result, has incurred and continues to incur significant damages due to Defendants' intentional misrepresentations.

259.    By falsely certifying their eligibility to receive payment on small business contracts and causing subsequent claims for payment to be made that the Defendants knew were ineligible for payment by government programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

64

260.    Defendants' unlawful conduct resulted in millions of dollars in improper payments from government programs.

261.    The ultimate submission to the Government of false claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.

262.    The United States paid the false or fraudulent claims.

263.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.    Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

264.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

265.    From 2015 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case, including the Anti-Kickback Act and FAR. Defendants falsely certified, expressly and impliedly, that their statements were true, accurate, and correct.

266.    Defendants' express and implied false certifications of compliance with the Anti-Kickback Act and FAR were material, because they went to the very essence of the bargain for which the United States contracted. The United States believed it was paying for services untainted by kickbacks and provided in compliance with FAR. Had the United States known of Defendants' corrupt provision or receipt of kickbacks, or their collusion during the bidding process, which resulted in the submission of ineligible claims for reimbursement, the United States would not have paid the claims.

65

267.     Given the structure of the Government contracting system at issue, the Defendants' conduct had the potential to influence the payment decisions of the Government. All of these certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind contracts or subcontracts.

268.     Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

269.     The United States paid the false or fraudulent claims.

270.     By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**C.     Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C))**

271.     Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

272.     By planning and implementing their schemes, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

273.     FAR forbids antitrust violations in the contracting process. Specifically, 15 U.S.C., Sections 1-7, define bid rigging, price fixing, and market allocation as illegal conduct. Defendants conspired to control multiple contract awards via the circumvention of a fair bid process utilizing schemes involving complementary bids, provision of false bids, and the provision of "low-bid" information.

274.     Defendants conspired to enter into mutually beneficial subcontracts that resulted in higher profits at the Government's expense. Defendants' conspiracy included the provision of

66

kickbacks in exchange for business and was material to the Government's loss.

275. Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

276. Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

277. The United States paid the false or fraudulent claims.

278. By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**PRAYER FOR RELIEF**

279. WHEREFORE, Relators respectfully request that the Court enter judgment against the Defendants and award the following:

(1) Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

(2) Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3) The maximum award Relators may recover pursuant to 31 U.S.C. § 3730(d);

(4) All costs and expenses of this litigation, including attorneys' fees and costs of court; and

(5) All other relief on behalf of Relators or the United States that the Court deems just and proper.

**D.      Count IV – Retaliation (31 U.S.C. § 3730(h))**

280.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

281.    In violation of 31 U.S.C. § 3730(h), the NOK Defendants retaliated against Relators because of lawful acts they conducted in furtherance of efforts to stop Defendants from committing violations of the False Claims Act.

282.    Relators have suffered economic loss and special damages because of the NOK Defendants' retaliatory acts and are entitled to relief pursuant to 31 U.S.C. § 3730(h).

<strong>PRAYER FOR RELIEF</strong>

283.    Relators pray that the Court enter judgment against the NOK Defendants for the following:

(1)      Two times the amount of Relators' back pay;

(2)      Interest on Relators' back pay;

(3)      Compensation for special damages sustained by Relators as a result of Defendants' actions;

(4)      Litigation costs and attorney fees; and

(5)      Any other relief the Court deems just and proper to make the Relators whole.

<strong>XII.<br>DEMAND FOR JURY TRIAL</strong>

284.    Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury.

68

## XIII.
## DOCUMENTARY EVIDENCE

285.   The following documentary evidence is referenced herein:

| Exhibit No. | Description |
|---|---|
| 1 | L&J October 9, 2019 Annual Report |
| 2 | November 1, 2018 subcontract between KOMAN and L&J |
| 3 | December 19, 2018 subcontract between KOMAN and L&J |
| 4 | April 10, 2019 subcontract between KOMAN and L&J |
| 5 | Contract Award, Specifications & Drawings and Solicitation, Offer, and Award for contract number W9126G-19C-0025 |
| 6 | May 10, 2019 El Paso Modular Project Prime Contract, no. W9126G-19C- 0027 |
| 7 | May 22, 2019 modification A00001 to contract number W9126G-19C-0025 |
| 8 | June 10, 2019 modification P00001 to contract number W9126G-19C-0025 |
| 9 | July 12, 2019 modification A00002 to contract number W9126G-19C-0025 |
| 10 | Statement and Acknowledgement for subcontract number FTW-ELP-0027-08000 |
| 11 | August 9, 2019 modification P00002 to contract number W9126G-19C-0025 |
| 12 | September 3, 2019 modification A00003 to contract number W9126G-19C-0025 |
| 13 | September 18, 2019 modification A00004 to contract number W9126G-19C-0025 |
| 14 | September 20, 2019 modification A00005 to contract number W9126G-19C-0025 |
| 15 | September 24, 2019 modification A00006 to contract number W9126G-19C-0025 |
| 16 | September 30, 2019 modification A00007 to contract number W9126G-19C-0025 |
| 17 | October 30, 2019 modification P00003 to contract number W9126G-19C-0025 |
| 18 | February 18, 2019 "Teaming Agreement" between KOMAN and Donley |
| 19 | July 2, 2019 e-mail chain regarding allocating compensation |
| 20 | July 10, 2019 e-mail from Robert Kyrklund |
| 21 | February and March 2020 emails with subject line "Mini-JOC (Job 10019) – Executed Base Contract and PM Questionnaire" |

| 22 | March 4, 2020 e-mail with subject line "Financial Audit from Corporate" |
|----|------|
| 23 | March 13, 2020 e-mail with subject "Formal Complaint against Matthew Yates and Natives of Kodiak" |
| 24 | March 13, 2020 e-mail from Allyson Thomas to Christopher Hicks |
| 25 | March 23, 2020 e-mail from Christopher Hicks to Allyson Thomas |
| 26 | E-mail from Allyson Thomas to Christopher Hicks attaching EAP flyer |
| 27 | EAP flyer |
| 28 | April 4, 2020 e-mail from Christopher Hicks to Mike Taylor, Jim Erickson, and Tom Berrett |
| 29 | April 2, 2020 Performance Improvement Plan for Christopher Hicks |
| 30 | April 6, 2020 e-mail exchange between Christopher Hicks and Jim Erickson |
| 31 | June 10, 2020 e-mails with subject "AOML Hurricane Repairs" |
| 32 | June 22, 2020 e-mails with subject "Demotion Questions" |
| 33 | August 25, 2020 e-mail from Mr. Hicks to Tania Gates |
| 34 | September 21, 2020 e-mail from Tom Berrett to Christopher Hicks |
| 35 | August 10, 2018 Donley proposal |
| 36 | May 1, 2019 email between Donley and Christopher Hicks |
| 37 | Donley JBAB Invoice |
| 38 | April 4, 2019 email from Jay Willems to Angela Gomez, Christopher Hicks, and Brian Donley |
| 39 | May 1, 2019 email from Chris Robertson to Christopher Hicks |
| 40 | April 15, 2020 email from Harold Weatherly to Angela Gomez |
| 41 | Hill AFB Contract |
| 42 | Receipts for subcontractors' bar tabs and trips |
| 43 | 2017/2018 Christmas gifts receipts |
| 44 | September 10, 2019 Declination Letter |
| 45 | Screenshot of Document Properties |

70

Respectfully submitted,

MOORE LANDREY, L.L.P.

/s/ *Greg M. Dykeman*
_____

Greg M. Dykeman
State Bar No. 06325100
905 Orleans Street
Beaumont, Texas 77701-3255
Telephone | (409) 835-3891
gdykeman@moorelandrey.com

THE LEIFESTE LAW FIRM, PLLC
Samantha L. Leifeste
State Bar No. 24116662
712 W. Division Ave.
Orange, Texas 77630
Phone | (409) 920-8863
sleifeste@sllf.onmicrosoft.com

BERG & ANDROPHY
David Berg
State Bar No. 01254700
3704 Travis Street
Houston, Texas 77002
Telephone | (713) 529-5622
Facsimile | (713) 529-3785
dberg@bafirm.comm

**COUNSEL FOR RELATORS ANGELA GOMEZ AND CHRISTOPHER HICKS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5. All counsel of record are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A).

/s/ *Greg M. Dykeman*
_____

Greg M. Dykeman

71